FRANCES B. NICOLL, Appellant, *v.* WILLIAM B. OGDEN *et al.*, Appellees.

APPEAL FROM COOK.

Real estate held in trust by one of several persons, partners in a speculation, is personalty. If, however, the trustee who holds such real estate in trust for the benefit of his copartners, subsequently conveys the same to other persons, and they, after receiving the deed from said trustee, and the legal title being vested in them, make a declaration of trust by deed, by the consent and at the request of the *cestuis que trust*, that they hold said property in trust for said *cestuis que trust*, specifying the proportion of said real estate belonging to each of said *cestuis que trust*, the character of said property becomes then changed; it ceases to be personalty, and is then to be treated as real estate, and it vests in each of said *cestuis que trust* an equitable title to their proportion of said real estate, of which a widow of one of said *cestuis que trust* is dowable.

A subsequent declaration of the objects and intents of said trusts, made by the said *cestuis que trust* at the request of said trustees, cannot so change the declaration of trust previously made by said trustees, by which an equitable title was vested in said *cestuis que trust*, as to deprive the widow of one of said *cestuis que trust* of her right to dower in the portion of the equitable estate of her deceased husband.

The difference between executory and executed contracts, considered, examined and explained.

ON the 9th day of February, 1861, the appellant filed her bill in chancery, in the Circuit Court of Cook county, against William B. Ogden, Mahlon D. Ogden, Edwin H. Sheldon, Charles Butler, Eliza A. Butler, James D. Wilson, Wesley Munger, George Armour, O. T. Snow, and the Chicago Dock and Canal Company, setting forth that Edward A. Nicoll was seized of an equitable estate of inheritance in certain tracts of land, therein specifically described, called the " Trust half of the Hunter property," and in · certain other tracts of land also specifically described, called the " Bard Trust property," and of a legal estate of inheritance in certain tracts of land situate in La Salle, Will and Grundy counties, in this State.

The bill alleges the marriage of the complainant with Edward A. Nicoll, before he became seized of any of the property mentioned, his death, and that the defendants, when the bill was filed, were seized of a legal estate of inheritance in parcels of the property in which she claimed dower, and prayed that the same might be set out to her in such parcels.

On the 5th day of September, 1861, the defendants filed their answer, to which the complainant filed a replication. The complainant, on her own motion, dismissed her bill as to Wesley Munger, George Armour and O. T. Snow. The cause was heard in the court below upon bill, answer, replication and proofs, and on the 15th day of March, 1862, the bill was *pro forma* dismissed, as to the residue of the defendants, from which decree the complainant appealed, and brings the case to this court.

The facts in the case are substantially as follows :

The complainant's marriage with Edward A. Nicoll, on the 3rd day of September, 1818, is admitted, and his death is also admitted to be established by evidence that is *prima facie* sufficient for the purposes of this suit. No question is raised in regard to the marriage of the complainant, nor as to her husband's death prior to the year 1859. The facts in regard to the property called the " Trust half of the Hunter property," are, that on or about the 1st day of December, 1834,

several gentlemen of New York, and among others, Edward A. Nicoll, entered into an adventure for the purchase and sale of Western lands.

The lands purchased were conveyed to Charles Butler, and were by him to be sold for the use and benefit of the adventurers. The nature and extent of the interest of the several adventurers was clearly defined in certificates issued to them severally by Mr. Butler, bearing date the first day of July, 1835. These certificates recite the purchase of the "Hunter property," so called, at Chicago, for one hundred thousand dollars, and that the adventure was divided into one thousand shares, of one hundred dollars each. They also state the number of shares held by each adventurer, and provide that the lands shall be sold, and a division made of the net proceeds among the several parties in interest. They also declare that the interest of each of said adventurers was a personal interest, to be accounted for in money, and not in land, when the property should be sold and the avails thereof realized. The "Hunter property," so called, was conveyed by Arthur Bronson to Frederic Bronson, December 1, 1834, and the unsold portions thereof were conveyed by Frederic Bronson to Charles Butler, by deed bearing date the eighth day of September, 1835, and absolute on its face, but, in fact, for the uses and purposes of said adventure.

After the adventure was entered upon, and prior to the first day of April, 1840, the interests of the several adventurers had changed, by the purchase, sale and transfer of shares held by them. Butler originally held a majority of the shares, but, at this time, he was the owner of just one-half of the same, and it became desirable that he should execute a further declaration of trust, setting forth the extent of the interest of the other persons then parties to the adventure, in and to the property and proceeds of the same. Accordingly, Butler, on the first day of April, 1840, made a declaration of trust, of that date, which recited the conveyance from Bronson, and set forth that Edward A. Nicoll and others had contributed and paid one-half part of the purchase money of the premises, and were entitled to a corresponding interest in the proceeds

thereof; as evidence of which right and interest, the said persons so entitled held certificates thereof, executed by said Butler, and that said Butler held the premises in trust, to sell and dispose of the same, and every part thereof, and divide the proceeds among the parties interested therein holding said certificates. The declaration of trust then declared, that Butler held the undivided one-half part of the premises conveyed to him by the deed of Bronson, except such parts thereof as had been sold, and also all lands conveyed to Butler in payment of or exchange for any portion of said premises, and all securities, debts and personal effects taken and received on account of sales thereof, in trust to manage and dispose of said premises, and every part thereof, for the interest of all concerned therein; and to sell, or contract to sell, and convey the premises, and every part thereof, at such time or times, for such prices, and upon such terms of payment, as said Butler might think proper, and to execute conveyances to purchasers; and after deducting from the proceeds all taxes, expenses, etc., to pay, distribute and divide the one-half part of the net proceeds unto and among said Edward A. Nicoll and others holding the said certificates of interest, executed by said Butler, according to the terms thereof.

Prior to the first day of April, 1842, a considerable portion of the property had been sold, and a large sum of money was due to the adventurers on account of the purchase money, which was secured by contracts, bonds, mortgages, etc.; and the adventure was indebted in considerable sums of money, which were expected to be paid out of the assets then on hand. The relative interests of the adventurers had also changed. At that time, Charles Butler was the owner of one-half, and the other half was owned as follows, viz.: Edward A. Nicoll, six-eighteenths; the assignee of Simeon Hyde, four-eighteenths; John S. Bussing, two-eighteenths; Chester Clark, two-eighteenths; Benjamin F. Butler, one-eighteenth; William B. Ogden, one-eighteenth; and Barton White, two-eighteenths. Butler had become embarrassed, and had executed a mortgage upon his undivided one-half interest. Under these circumstances, it became desirable that the half

interest in the unsold property, not belonging to Butler in his own right, should be transferred to other trustees, and that the whole assets of property which had been sold should be placed in the hands of a trustee, for the purposes of the original adventure. Accordingly, Butler, at the request of the other parties in interest, on the first day of April, 1842, conveyed to Edward A. Nicoll and Orsamus Bushnell the undivided one-half of all of the unsold property. This deed was absolute on its face, and conveyed the property to them, therein designating them as trustees, and conveying to them, and to the survivor of them, and to the heirs and assigns of such survivor, forever, to have and to hold as joint tenants, and not as tenants in common, and to the survivor of them, and the heirs and assigns of such survivor, to his and their use forever.

On the same first day of April, 1842, Butler assigned all of the assets then in his hands belonging to the adventure, to William B. Ogden, for the purpose of being reduced into money, and divided among the parties in interest, in accordance with their respective rights thereto. The account of Butler with the adventure was, at the same time, settled, and in consideration of the above conveyance and assignment, he was released by the other parties in interest from all further obligation growing out of his position as trustee for the adventure. Butler having thus withdrawn his individual interest in the adventure, it was continued for the benefit of the other parties in interest. One portion of the adventure was continued under the assignment from Charles Butler to William B. Ogden, and the other portion was continued under the deed from Mr. Butler to Nicoll and Bushnell. At the time of the execution of the above mentioned conveyance from Butler to Nicoll and Bushnell, the trusts upon which the same was executed were not declared, but afterwards, by an instrument bearing date the 12th day of April, 1842, the said Nicoll and Bushnell declared that said premises were conveyed to them in trust for the several parties entitled thereto, to wit, John S. Bussing, Edward A. Nicoll, William B. Ogden, Benjamin F. Butler, Charles Butler, trustee, Chester Clark, and

Barton White, and designating their respective interests, and agreeing, that whenever partition should be made of the premises, they would convey to each of the parties entitled, his share in severalty ; and that if before such partition should be made, any part of the premises should be sold, they would account for the proceeds of such sales to the parties in interest, according to their respective rights, after deducting therefrom all expenses, charges, taxes, assessments, etc., incident to the execution of the trust thereby declared.

Nicoll and Bushnell desiring a more particular declaration of their powers and duties as trustees, the parties then interested in the adventure, that is to say, John S. Bussing, Edward A. Nicoll, William B. Ogden, Benjamin F. Butler, Charles Butler, trustee, Chester Clark, and Barton White, by an instrument under their hands and seals, bearing date the 25th day of April, 1842, after reciting the conveyance by Butler to the said trustees, and the declaration of trust made by them above referred to, and that a declaration of the objects and intents of said trust was desired and required of said parties in interest by said trustees, with a view to express and define their powers, declared, that the objects and intents of said trust were, that whenever partition should be made of the premises, the trustee should convey to each party his share in severalty, and that said trustees might, before such partition, sell and convey the premises, or any part thereof, to any person or persons, for such prices and upon such terms of payment as said trustees might think proper, with power to appoint an attorney for that purpose; the said trustees accounting to said parties in interest for the proceeds of such sales, according to their respective rights, after deducting therefrom all expenses, etc.

On the 31st day of May, 1842, Nicoll sold and conveyed to Abel T. Anderson, two-thirds of his interest in the adventure, being four-eighteenth parts of the same ; and on the 27th day of September, 1842, Nicoll sold and conveyed to Thomas J. Oakley his remaining one-third interest in that portion of the property of the adventure which was conveyed to him and Bushnell, as trustees. The remaining interest of Nicoll in

the adventure was afterwards, on the 23rd day of December, 1842, assigned to Abel T. Anderson.

On the 3rd day of January, 1843, it was agreed between all the parties beneficially interested in that portion of the Hunter property which had been conveyed by Charles Butler to Nicoll and Bushnell, that partition should be made of said property between the said Charles Butler and the said trustees; and a deed of partition, dated January 1, 1843, between Charles Butler on the one part, and said Bushnell on the other part, was executed, whereby a certain part of the property was conveyed by Bushnell to said Butler, and certain other portions of the property were conveyed by said Butler to said Nicoll and Bushnell. Which property last mentioned, is called the " Trust half of the Hunter property."

By a decree of the Cook County Court, rendered on the 6th day of August, 1845, in a suit wherein John S. Bussing, Chester Clark, Thomas J. Oakley, Abel T. Anderson, Isaac A. Johnson—who had acquired one-half of the interest conveyed by Edward A. Nicoll to Abel T. Anderson, by the deed of May 31, 1842—Benjamin F. Butler, Barton White, William B. Ogden, and Charles Butler, trustee, were complainants, and Orsamus Bushnell and Edward A. Nicoll were defendants, the said Nicoll was removed from his trusteeship, and the powers theretofore vested in Nicoll and Bushnell, jointly, were declared to be vested in Bushnell alone; and the partition made between Bushnell and Butler, by their deed of January 1, 1843, was confirmed.

Between the first day of April, 1842, and the 10th day of April, 1846, portions of the Trust half of the Hunter property were sold and conveyed, and contracted to be sold, by William B. Ogden, as the attorney in fact of Nicoll and Bushnell, and of Bushnell alone.

On the 10th day of April, 1846, all the parties interested in the adventure, that is to say, Charles Butler, trustee, Benjamin F. Butler, John S. Bussing, Chester Clark, Abel T. Anderson, Isaac A. Johnson, Thomas J. Oakley, and Barton White, sold and conveyed to William B. Ogden all of their interest in the entire adventure.

22

On the 5th day of November, 1846, Orsamus Bushnell released and quit-claimed to William B. Ogden all the right, title and interest, that he then had in the premises, which were conveyed to said Nicoll and himself. And on the 5th day of November, 1858, the said Orsamus Bushnell, by his deed of that date, conveyed and confirmed unto William B. Ogden, the premises described in his former deed. The appellant claims dower in certain lots and tracts of land, the title to which became vested in William B. Ogden, under the three conveyances last mentioned, or some one of them, and the defendants claim title under or through said conveyances, or some one or more of them.

ARRINGTON & PEABODY, for Appellant.

The lands in which the bill of appellant seeks to establish the right of dower, may be classed under three divisions, as follows:

The Trust Half of the Hunter property;

The Bard Trust property;

Country Lands.

These will now be considered in their order.

THE TRUST HALF OF THE HUNTER PROPERTY. The essential and undisputed facts in relation to this part of the case, are the following:

1. On the 1st of December, 1834, an association was formed in the city of New York, for the purchase and sale of Western lands, and afterwards, in accordance with the general object, the Hunter property was bought and conveyed to Charles Butler, as the trustee and agent of the association; the purchase money being $100,000, and paid by the several members in certain proportions.

2. On July 1st, 1835, Butler issued separate certificates to the members of the association, defining their interests, or shares in the partnership, and stating " that the interest of each was to be accounted for, in money, and not in land."

3. Edward A. Nicoll, the husband of the appellant, was, from the first, a member of the association.

4. April 1st, 1840, Butler made a declaration of trust, setting forth that Nicoll and others paid one-half the purchase money for the Hunter property, etc.

5. April 1st, 1842, by agreement of all the parties in interest, Butler conveyed the undivided half of the Hunter property to Nicoll and Bushnell, and to the survivor of them, and to the heirs and assignee of such survivor.

6. April 12th, 1842, Nicoll and Bushnell made a declaration of trust, stating that they held six-eighteenths of the undivided half of the Hunter property for the said Nicoll, and the remainder for other beneficiaries therein specified, and promising, that whenever partition of the premises should be made, (the same to be effected within six months, if practicable,) they would convey to each of the beneficiaries, "his heirs and assigns, his part or share of the premises in severalty."

7. April 25th, 1842, the beneficiaries, at the request of Nicoll and Bushnell, signed an instrument setting forth the trust of Nicoll and Bushnell, in nearly the same terms as the preceding declaration, and giving express authority to the trustees, before partition, to sell any part of the trust premises, but to account for the proceeds.

8. May 31st, 1842, Nicoll conveyed two-thirds of his interest in the Hunter property to Anderson.

9. Sept. 27th, 1842, Nicoll conveyed the remaining one-third of his interest in the Hunter property to Oakley.

10. The marriage of the appellant with Nicoll is admitted, as well as the death of Nicoll.

11. April 10th, 1846, all the beneficiaries sold and conveyed to Ogden.

12. Nov. 5th, 1846, Bushnell, the trustee, quit-claimed to Ogden.

Hence, the only question for the court, as to the Hunter property, is this:

Had Edward A. Nicoll, by virtue of the deed from Butler to Nicoll and Bushnell as trustees, and by virtue of their subsequent declaration of trust, an equitable estate of inheritance?

Because, it is a rule of our statutory law, under the settled

construction of this court, that the right of dower attaches upon equitable estates of inheritance. Laws of 1839, p. 698; *Davenport* v. *Farrar*, 1 Scam. 315; *Owen* v. *Robbins*, 19 Ill. 545; *Porter* v. *Ewing*, 24 Ill. 619.

And no one will dispute the legal proposition, that when the right of dower has once attached, it can only be defeated by the appropriate act of the wife.

Therefore, the sole and decisive question recurs: Had Edward A. Nicoll, before the alienation of his interest, an equitable estate of inheritance in the Hunter property?

We assert the affirmative, and submit, that it is proved in the clearest manner, as well by the declaration of trust made by the trustees, as by the subsequent agreement or declaration of the beneficiaries. In support of this view, we invoke attention to the following points of construction.

The declaration of Nicoll and Bushnell is express, "that they hold the premises in trust."

Therefore, they did not hold for their own use. And therefore, they must, *ex necessitate*, have held in trust, or for the use of some one else. The equitable ownership did not pertain to Nicoll and Bushnell, as trustees. But the equitable ownership must have attached to some one. No person, however, is named in the declaration of trust, other than the enumerated beneficiaries. Therefore, these must have been clothed with the equitable ownership.

The declaration of trust specifies the beneficiaries, and defines their respective interests: "We hold the same in trust for Edward A. Nicoll, who is entitled to six-eighteenth parts thereof," etc.

Here, Edward A. Nicoll has a vested equitable estate of inheritance in one undivided third part of the trust half of the Hunter property. Because, there is no limitation of an estate less than a fee. And by the laws of Illinois, "every estate in lands is deemed a fee simple, if a less estate be not limited by express words." Laws of 1839, p. 51.

The declaration of Nicoll and Bushnell is positive in terms, not only that "they hold in trust" for the persons specified, but also, that the trustees shall, upon partition, "convey to

each of the persons," named as beneficiaries, "his heirs and assigns, his part or share of the premises in severalty by deed."

Hence, this equitable estate was transmissible, not to the personal representatives of the beneficiary, in case of his death, but to his heirs. But who will say that this is not the proper and infallible criterion of an estate of inheritance? How then can it be pretended that this was not an estate of inheritance? If Nicoll had died the day after the declaration of trust, the estate, beyond all controversy, would have gone to his heirs, because it was an estate of inheritance. But will any one deny that, in such case, his wife would have been entitled to dower? But if she ever would have been entitled to dower, in the event of the husband's death, she is so entitled still.

The declaration of trust vested no preceding estate before that of Nicoll and the other beneficiaries, and limited no remainder to come afterwards. And therefore, again, since the trustees had no equitable ownership, the equitable fee, unless *in nubibus*, must have belonged to the beneficiaries.

Such is the strength of the arguments in favor of the affirmation. And now let us examine what may be urged by way of objection, from the other side.

There are but three possible theories, which can be suggested by human ingenuity, to defeat the claim of appellant.

*First.* That the Hunter property, being held in partnership, was stamped with the character of personalty, and still retained that character at the date of Nicoll's alienation.

*Second.* That the nature of the trust, in respect to Nicoll and the other beneficiaries, was executory; and that dower does not attach upon executory trusts.

*Third.* That the trustees had a power of sale which, if exercised, would defeat the right of dower; and that such power was exercised.

Although the first of these theories has not been distinctly propounded by opposing counsel, in relation to the Hunter property, yet, as it is the only one which, in our judgment, has any show of plausibility, it must be subjected to a brief analysis.

*First Adverse Theory.* That these lands being originally bought for a partnership purpose, were, *ipso facto*, as well as by express terms, converted into personalty.

The most general answer to this is, that the declaration of trust constituted the beneficiaries, tenants in common of an equitable interest in the realty, and without one attribute of partnership relation, and therefore operated as a re-conversion. But there are several more precise and perfect answers to the theory, and among others, the following:

1. By the declaration of trust, the share of each beneficiary in the land was definitely ascertained. But the designation of these aliquot shares operated *per se* to exclude the character of personalty. 1 Amer. Lead. Cases, p. 488.

2. The share of each beneficiary was transmissible, not to his personal representatives, but to his heirs. But this was an absolute negation of the idea of personalty.

3. The declaration of trust, and the subsequent agreement of the beneficiaries with the trustees, reveal the clearest intention to treat the land as land, and not as personalty or partnership stock. Hence, the rules of equitable conversion do not apply. 1 Amer. Lead. Cases, p. 489; *Frink* v. *Branch*, 16 Conn. 261.

4. But if these beneficiaries could be regarded as partners, it would not avail the appellee, because the doctrine of equitable conversion is only enforced in favor of the other partners, so far forth as they may be entitled to an account, and in behalf of the partnership creditors, etc. 1 Amer. Lead. Cases, pp. 488, 490; *Dyer* v. *Clark*, 5 Metcalf, 562, 582; *Howard* v. *Priest*, ib. 582; *Pierce* v. *Wiggs' Heirs*, 10 Leigh, p. 408.

But the appellee does not fall within either of the preceding categories. He is not a partner seeking an account, nor a creditor asking payment out of partnership assets.

5. Again, if these lands had been partnership stock, since the partnership account had been adjusted, and the object of the trust fulfilled, before Nicoll conveyed his interest, the right of dower attached. 1 Amer. Lead. Cases, p. 492; 1 Parsons' Cont., pp. 128, 129; *Goodburn* v. *Stevens*, 5 Gill. 2—27; Adams' Equity, p. 138; *Lang's Heirs* v. *Waring*, 17 Alb. 145; *Greene* v. *Greene*, 1 Ham. 244; *Richardson* v.

*Wyatt*, 2 Dessaus. 471; *Burnside* v. *Merrick*, 4 Metcalf, 541; *Peck* v. *Fisher*, 7 Cushing, 386; *Smith* v. *Smith*, 5 Ves. 189.

6. Although, at the origin of the adventure, the lands were, by agreement, converted into personalty, yet it was competent for the parties, by a mere change of intention, to re-convert the property into real estate. 1 Eq. Lead. Cases, p. 160; *Rowley* v. *Adams*, 7 Beav. 548.

"The re-conversion need not be evidenced by an express declaration of change. It is sufficient, if the conduct of the parties show an intention to deal with the property in its original, instead of its converted character." Adams' Equity, p. 137.

7. So soon as the original, partnership speculation was abandoned, and the land resumed its character of realty, even without any declaration of trust, a trust would have resulted in favor of the beneficiaries who, at first, paid the purchase money. 2 Story's Eq. Jur., sec. 1201.

Hence, according to any legal view, it is impossible to hold that the Hunter property retained any characteristic of personalty, after the declaration of trust.

*Second Adverse Theory.* That the trust, in relation to Nicoll and the other beneficiaries, was merely executory; and hence, no equitable estate of inheritance became vested, to which dower could attach.

This theory seems to be the chief reliance of the learned counsel for the appellee, but notwithstanding our great respect for his legal ability, we find a difficulty in even comprehending the logical process by which he arrived at such a result. Yet, perhaps, after all, this perplexity of ours is not surprising, for few lawyers have ever entered that tangled maze—the subject of executory trusts—*inter extremos apices juris*—without losing themselves in the labyrinth. In *Bagshaw* v. *Spencer*, 1 Ves. 142, Lord Hardwicke confounded executory and executed trusts; while in the great case of *Perrin* v. *Blake*, 4 Burr. 2579, Lord Mansfield denied that there was any distinction between the two supposed classes of trusts.

However, let us endeavor to follow the arguments of the appellee's counsel, and, as nearly as may be, in his own order of development.

As the foundation of his first argument, Mr. Beckwith cites the definition of Chancellor Kent—"Trusts are of two kinds, executory and executed. A trust is executory when it is to be perfected at a future period by a conveyance or settlement, as in the case of a conveyance to B in trust, to convey to C. It is executed when either the legal estate passes, as in a conveyance to B in trust, or for the use of C; or when only the equitable title passes, as in the case of a conveyance to B, to the use of C, in trust for D. The trust in this last case is executed in D, though he has not the legal estate." 4 Kent's Com., p. 304.

Now, the first remark to be made in regard to this definition, is, that it is illogical in embracing in one formula two species of executed trusts, namely, that where the statute of uses executes the trust by converting it into a legal estate, and another kind widely different, where the trust is considered as executed merely in the contemplation of a court of equity.

But waiving this criticism, we are willing to accept the definition as a proper test in the present case. Apply, then, the first branch of it. "A trust is executory when it is to be perfected at a future period by a conveyance or settlement, as in the case of a conveyance to B in trust, to convey to C."

Will any one say that such is the case here? Not at all. On the contrary, the language of the declaration vests the equitable interest in praesenti. "We hold the same (premises) in trust for Edward A. Nicoll, who is entitled to six-eighteenth parts thereof."

Hence, the trust is already executed, and not to be perfected at a future time.

"But," Mr. Beckwith will reply, "a conveyance was to be executed at a future time." Certainly, yet for what purpose? Not to complete the trust, but to make partition of the premises among the beneficiaries. Now, will the learned counsel say that the necessity of a future conveyance to make partition, renders a trust executory? For if he says that, he is driven to the absurdity of laying down the rule—that no trust ever can be deemed executed, where there is more than one beneficiary; because in such case, a conveyance is always necessary. Indeed, Mr. Beckwith's whole argument has

fallen into the fog which was, long ago, indicated by Lord Eldon. "One is a good deal confused," says the great master, "by the inaccuracy of the expressions 'trust executory,' and 'trust executed.' The latter, no doubt, in one sense of the word, is a trust executory—that is, if it is a trust for B, or for B and others; that, in this sense, is executory, that B or B and other persons, may call upon A to make a conveyance, and execute the trust." *Jervoise* v. *Duke of Northumberland*, 1 J. & W. 570, cited in Lewin on Trusts, p. 146.

But let us take the other branch of Chancellor Kent's definition. "A trust is executed when the equitable title passes, as in the case of a conveyance to B, to the use of C, in trust for D."

This is clear; because, the statute converts the use in C into a legal estate, and then by the terms of the conveyance, C holds, not for himself, but in trust for D. Well, that is precisely the present case. Nicoll and Bushnell held, not for themselves, but in trust for the beneficiaries, the latter being expressly declared to be entitled to the profits.

However, it may be necessary to adduce other authorities as to the distinction between the two classes of trusts in question.

"A trust executed is where the limitations of the equitable interest are complete and final; in the executory trust, the limitations of the equitable interest are intended to serve merely as minutes or instructions for perfecting the settlement at some future period." Lewin on Trusts, p. 144.

"The true criterion is," said Lord Northington, in *Austin* v. *Taylor*, 1 Ed. Eq. 115, "wherever the assistance of a court of chancery is necessary to complete a limitation, in that case, the limitation in the will not being complete, that is sufficient evidence of the testator's intention that the court should model the limitations; but where the trusts and limitations are already expressly declared, the court has no authority to interfere, and make them different from what they would be at law." See *Neves* v. *Scott*, 9 How. 211.

In Adams' Equity, p. 40, "an executed trust" is property characterized as one "of which the scheme has in the outset

been completely declared;" and an executory trust as one "of which the scheme has been imperfectly declared in the outset, and the creator of the trust has merely denoted his ultimate object," etc.

And to the same effect are the following authorities: Hill on Trustees, p. 328; 1 Sanders on Uses and Trusts, p. 336; 1 Hilliard on Real Prop., p. 301; 2 Story's Eq. Jur., sec. 983.

In 2 Hilliard on Real Property, p. 348, the distinction is stated with admirable clearness. "If the deed is final, definitely fixing the trust, so that the only future change must be a mere transfer by the trustee, for the purpose of clothing the equitable estate with a corresponding legal title; in other words, if the trust is an executed one, the instrument is construed no less strictly than a legal conveyance. If, on the other hand, the trust is executory, or left open, to be established and completed by a future conveyance, to which reference is made in the original deed, in decreeing such conveyance, the original deed will be liberally construed, according to the intention."

Hence, according to all the cases, the test of an executory trust is, not the necessity of a conveyance to pass the legal title to the beneficiary, because that is always necessary in every species of trusts, but the necessity of a conveyance to define and settle the trust itself.

But the principal source of confusion in Mr. Beckwith's argument, originated in his failure to discriminate the peculiar circumstances under which the doctrine of executory trusts is usually invoked. It is nearly, if not quite, always called into exercise, by courts of chancery, for the purpose of excluding special cases from the operation of the rule in *Shelley's Case*, 1 Eq. Lead. Cases, top page, 29 *et seq.*

And every case cited by counsel, falls within this category.

Thus *Edmondson and Wife* v. *Dyson*, 2 Kelley, p. 307, quoted 1 Eq. L. C., top page 42, turned upon an attempt to apply the rule in Shelley's case.

The facts were these: Mrs. R. devised her whole estate to D. in trust for the use of her husband during his natural life, and directed that at his death the trustee should convey the

property in trust, to such person as the husband should by will appoint, and if he should die intestate, then the trustee should convey the property to the heir or heirs-at-law of the husband. The husband died intestate; and the question in the case was: "Whether a child of the husband took as a *purchaser* under Mrs. R.'s will, or whether the whole estate vested in the husband, and the child took as his heir-at-law."

The decision was, "that from the fact that a testator has directed a conveyance to be made by a trustee, courts of equity will declare a trust *executory* in contradistinction to *executed;* and will defeat the rule in Shelley's case in favor of the intention of a testator, by decreeing a conveyance in pursuance of his intention."

The case of *Berry* v. *Williamson,* 11 B. Mon. 245, cited in Mr. Beckwith's brief, p. 21, is of the same character.

For what purpose, then, does the counsel adduce these cases? Is there any occasion, here, to exclude the rule in Shelley's case? Is there any limitation here, by way of remainder, after the freehold in the first beneficiaries? Has the counsel forgotten even the definition of the rule in Shelley's case? See 4 Kent's Com., p. 215. Or, will it be contended seriously, that Nicoll and the other beneficiaries took only an equitable estate for life, with a limitation over to their heirs?

Besides, the doctrine of executory trust arises only under marriage articles, wills, or family settlements. But the present case has no sort of relation to such instruments. See Lewin on Trusts, p. 147; 2 Story's Eq. Jur., sec. 983; Sanders on Uses and Trusts, 337, 338; Jeremy's Equity, pp. 31, 32; 1 Chance on Powers, sec. 258; 2 Fearne on Remaind., p. 244, sec. 488.

Counsel on the other side contends that the point in controversy has been settled by this court, in *Porter* v. *Ewing,* 24 Ill. 617, and that the uniform rule is—" that the husband must have had, in his lifetime, a complete and perfect right to demand the legal title of him who held it for his use."

The true rule, though in a concrete form, was announced in *Porter* v. *Ewing:* "Until Porter " (the beneficiary) "was in

a position to demand a deed of Brown" (the supposed trustee) "without doing anything more on his part, he had not such an equitable estate in the premises, as to entitle his widow to dower in them."

We are willing to accept the rule, thus stated as a test, in the present case. For, was there anything more to be done here, either on the part of the trustees or beneficiaries, before the latter were entitled to claim a conveyance of the premises?

The learned counsel will answer, "that partition remained to be made, before conveyance."

But we ask, before what kind of conveyance was partition to be made? The declaration of trust says, "before a conveyance to each beneficiary of his share in severalty."

Now, it is plain that the necessity for a partition, before any conveyance of the shares in severalty, resulted not from the agreement of the parties, or limitations of the trust, but from the nature of the case. Because it was a legal impossibility that any one of the beneficiaries could have his share in severalty, until that share had been set apart from the property in mass. Hence, the promise to convey in severalty, after partition, imposed no duty on the trustees other than what the law would imply without any promise. And therefore, the insertion of the promise to convey in severalty, after partition, was merely null, according to the maxim—*expressio eorum quae tacite insunt nihil operatur.* Broom's Max., p. 519; 1 Spence Eq. Jur., p. 525; 2 id., p. 131.

Suppose, then, that all the beneficiaries had desired the trustees to convey to them the property undivided, before partition, would they not have been entitled to a conveyance? Manifestly so. Because even before partition, the beneficiaries had an exclusive right to the profits, and the trustees had not one particle of beneficial interest in the premises.

Finally, under this head, if dower never attaches to the equitable estate of a beneficiary before partition, then the widow of a tenant in common can never have dower in the equitable estate of her husband, and the statute, *pro tanto*, stands repealed by judicial construction. We cannot believe that this court will so decide.

*Third Adverse Theory.* That the trust, in this case, was coupled with a power, the exercise of which defeated the right of dower.

The argument of the counsel for the appellee, on this part of his subject, may be reduced to the following pointed syllogism:

A. The trustees possessed a power of sale, which, if exercised, would defeat the right of dower.

B. That power of sale was exercised.

C. *Ergo:* the right of dower was defeated.

Now, we contest both propositions; and if we can show either to be invalid, the conclusion of course falls to the ground.

And *first,* let us consider Mr. Beckwith's major. The counsel says: "As soon as the power granted or reserved in the instrument settling an estate is exercised, by changing the old and appointing other uses to which the grantee is to stand seized, the estate of the grantor is drawn to the new uses as soon as they arise, by means of the power and the statute which executes the possession. An appointment under a power operates to substitute one *cestui que use* for another, or to substitute new uses for the old ones in the same *cestui que use.*"

And he cites 4 Kent's Com., p. 316, and many other authorities, every one of which refers to powers deriving their effect from the statute of uses.

Now, to this view of counsel, there are several overwhelming objections:

The first objection, and one which disposes of all his authorities as totally irrelevant, is, that the statute of uses has no sort of application to the present case, and for the simple reason that the second section of the statute, 27 Hen. 8, has not been adopted in Illinois. See Rev. Stat., chap. 24, sec. 3, and the English statute in 1 Sanders on Uses, etc., p. 72.

Therefore, since our statute only executes the possession when the grantees stand seized to the use of others, and Nicoll, one of the grantees here, held partly in trust for himself, the use could not be executed; if this had not been so, the beneficiaries would have taken the legal estate.

However, it is useless to argue this point further; because Mr. Beckwith cannot pretend that the statute converted the interest of those beneficiaries into a legal seizin. For, if this were the case, the widow would unquestionably be entitled to legal dower. What, then, becomes of his host of authorities? They might as well be silent. They do not speak to the case.

The power of sale vested in those trustees was a mere common law authority, derived, by express agreement, from the beneficiaries themselves. And the distinction between such powers and those derived from the statute of uses, has been finely stated by Chancellor Kent:

"The powers with which we are most familiar in this country, are common law authorities of simple form and direct application; such as a power to sell land, to execute a deed, to make a contract, or to manage any particular business; with instructions more or less specific, according to the nature of the case. But the powers now alluded to, are of a more latent and mysterious character, and they derive their effect from the statute of uses. They are declarations of trust and modifications of future uses; and the estates arising from the execution of them have been classed under the head of contingent uses." 4 Kent's Com., p. 315.

On the same page, the author adds: "All these powers are, in fact, powers of revocation and appointment. Every power of appointment is strictly a power of revocation; for it always postpones, abridges, or defeats, in a greater or less degree, the previous uses and estates, and appoints new ones in their stead."

Can it be a question as to which of these two classes of powers, the authority vested in Nicoll and Bushnell belonged? It was not in any power to change or revoke uses, and appoint others in their stead. It was a simple power to sell land, and to pay over the proceeds to the beneficial owners.

Besides, the power itself emanated from the beneficiaries, and not at all from Butler, the grantor of the legal title. In the view of a court of equity, Butler was not the owner of the land; and the answer expressly concedes that he conveyed

it to Nicoll and Bushnell, at the desire and request of the beneficiaries.

The proposition is, indeed, susceptible of legal demonstration, that the power of sale in Nicoll and Bushnell was a mere common law authority. The decisive question is—*from whom was that power actually derived?* Who was the real donor of that power in the contemplation of a court of law, and more especially, of a court of equity? To whom did the property belong, before and at the time when it was conveyed to Nicoll and Bushnell? To this inquiry, there can be only a single answer, whether you call the property real estate or personalty. The true owners were the beneficiaries, who paid for the property. It did not belong to Butler, who held the legal title merely in trust, and who was no more than an agent for the equitable owners. Hence, the maxim, which lies at the foundation of all powers and trusts—*cujus est dare ejus est disponere*—excludes the possibility that the power could have emanated from Butler, because the property was not Butler's to give or grant; and therefore, the power of sale could be nothing else than a common law authority conferred by the beneficiaries.

It is, therefore, submitted, that the exercise of such a power of sale could not defeat the right of dower. Can a power of sale given to an attorney by the husband, ever operate to defeat the dower of the wife? Surely, one cannot do *per alium* what he cannot do *per se.*

But secondly, let us examine briefly Mr. Beckwith's minor proposition, to wit, that the power of sale vested in the trustees was exercised.

It is needless to remark, that unless the power of sale were exercised, whatever might have been its potential efficacy in *abstracto*, it could have no operation to take away the right of dower. Hence the final and decisive question emerges, Was the power exercised—did the trustees sell this land? That they did not, is apparent from the following considerations:

*First.* Bushnell's deed to Ogden contains no reference to any power of sale.

But Bushnell had a legal interest in the land, as well as a power. He had the legal title, at least in part. And a legal title is a legal interest. The word, interest, *ex vi termini*, extends to estates, rights, titles, etc. Co. Litt. 345 *b*.

And where an interest and a power exist in the same person, an act done without reference to the power, is construed to operate on the interest only. 4 Kent's Com., p. 334.

*Second.* The power of the trustees was to sell the land itself, coupled with a corresponding duty to pay over the proceeds to the beneficiaries.

But " a sale is a transmutation of property, for a consideration or recompense in value." 2 Black. Com., p. 449.

" This is the precise legal import of the term." *Williamson* v. *Berry*, 8 How. 544.

But the first deed from Bushnell to Ogden, does not even purport to be a sale. It is a mere quit-claim for the expressed nominal consideration of one dollar. Nor is there the slightest pretense for saying that any purchase money was paid in the case.

Hence, there was no sale, in the legal acceptation of the word ; and consequently there could be no execution of the power.

*Third.* The power of sale in the trustees was an authority to transfer the equitable interests of the beneficiaries, the real owners, and to account to them for the proceeds.

But Bushnell could not, at the date of his deed to Ogden, sell to the latter the interests of the beneficiaries. Because Ogden, long before, had purchased those very interests from the beneficiaries themselves. In other words, Ogden, by sale from the equitable owners, had then become sole equitable owner. Surely, then, Bushnell could not sell to Ogden what the latter already possessed. And hence, the deed of Bushnell to Ogden was no execution of the power of sale.

*Fourth.* There existed in these trustees, not only a power of sale, but a concurrent trust, to convey to the beneficiaries, after partition. And these were obviously exclusive of each other. If the trustees sold, they could not convey to the beneficiaries ; and if they conveyed to the beneficiaries, it could only be that which they had not sold.

But when Bushnell conveyed to Ogden, the latter was sole beneficiary.

Hence, although Bushnell's conveyance to Ogden was no execution of the power of sale, it was a fulfillment of his duty to convey.

Therefore, from all that has been said, we are entitled to deduce the ultimate conclusion, that if such a power of sale did, in fact, exist as would effectually defeat the right of dower, supposing it to have been exercised, yet as it was never exercised, the right of dower is perfect.

Because the rule is well settled, " that while a power remains without execution, the estates limited, in case of its non-execution, are vested, and not contingent interests." 2 Hilliard on Real Property, p. 592.

BARD TRUST PROPERTY. The facts in relation to this part of the case, are briefly these :

1. On April 20th, 1835, an agreement was formed for the purchase and sale of western lands between Kinzie and Pearson of the first part, and Nicoll, Butler and others of the second part, by which the parties of the second part were each to furnish the sum of $5,000, and Kinzie and Pearson were to act as agents in the purchase and management of the lands, taking the title in their own names, to hold in trust for the common benefit. The lands were to be charged with the repayment of the money advanced for the purchase, with interest ; and then all the net profits to be divided equally between Kinzie and Pearson on the one part, and the parties of the second part on the other. The arrangement was to continue in force until July 1, 1840, when the adventure was to be closed.

2. Nicoll and nine others paid their $5,000 each, and Kinzie and Pearson paid it out for land.

3. July 1, 1835, Kinzie and Pearson made a schedule of the lands purchased, and therein declared that they held them in trust for the purposes of the said agreement.

4. July 26, 1841, by consent of all the parties, Kinzie and Pearson, in consideration of $550, and of the cancelment of

23

the said agreement, conveyed all the unsold land to William Bard, one of the beneficiaries.

5.   On the same day, Kinzie and Pearson declared by deed, that they conveyed the lands to Bard, at the request and for the benefit of the parties interested in the original agreement, who had advanced the purchase-money therefor.

6.   December 23, 1842, Nicoll conveyed all his property to Anderson, in trust to pay certain debts.

7.   February 6, 1843, Anderson conveyed all the property assigned to him by Nicoll, to Bard, upon the same trust to pay Nicoll's debts.

8.   August 1, 1843, by mutual agreement of the beneficiaries, partition was made of the Bard trust property, and each beneficiary received a conveyance of his share, (one-tenth), by deed from Bard; with the exception of Nicoll's interest, which Bard still retained.

9.   Each of the deeds from Bard to the beneficiaries contained a recital " that the conveyance from Kinzie and Pearson, although absolute in terms, was made in trust for the persons who were the owners of the premises ;" and specified the respective shares of the beneficiaries as being each one-tenth.

10.   October 26, 1846, Bard conveyed to Ogden the share in the premises formerly owned by Nicoll.

Under this state of facts, it is submitted that the claim of the appellant to dower in the Bard trust property, cannot be resisted with any show of reason.   And more especially, since this part of our case stands unembarrassed by any of the misty questions relating to executory trusts, and powers appendant.   For, even the learned counsel for the appellee makes but a faint show of pretending that Bard possessed an authority to sell by virtue of his character of trustee; as if there could be any power conferred by parol to sell real estate, when Bard, in his own declaration of trust, gives no intimation that he considered himself endowed with such a power.

Indeed, most of the arguments urged under the former

head, apply here, with still greater force. But a few additional considerations may be mentioned.

*First.* The deed from Kinzie and Pearson to Bard, expresses that it was made in consideration of the canceling of the antecedent agreement and bond, by which the adventure was inaugurated; while the declaration of Kinzie and Pearson, and the bill and answer taken together, show that the new arrangement was effected with the assent, and at the instance of the beneficiaries.

Hence, the allegation of the bill, that the original partnership speculation was abandoned, at the time of the conveyance to Bard, is fully established.

Therefore, if the lands had before assumed the character of personalty, when they were transferred to Bard, to hold in trust for the beneficiaries in undivided equal shares, a re-conversion necessarily took place.

*Second.* The theory is inadmissible that Bard succeeded to the same identical trusts and power of sale which appertained to Kinzie and Pearson.

Because the declaration of Kinzie and Pearson, executed contemporaneously with their deed to Bard, says, in terms, "that Bard is to hold in trust for those who paid the purchase-money;" and Bard declares, in his subsequent deeds, "that he held in trust for the owners, each one of whom was entitled to one-tenth part of the premises."

But such was not the trust of Kinzie and Pearson. They held to sell for the benefit, not only of the beneficiaries, but also for their own benefit; and had even the right to retain one-half the clear profits.

Therefore, it is demonstrable that the trust vested in Bard was altogether different from the power and trust belonging to Kinzie and Pearson.

*Third.* The original partnership agreement, at the date of the deed to Bard, had expired by its own limitation; and the record contains no shadow of proof that it was the intention of the parties to such agreement to keep it still alive, or to continue the partnership adventure.

Hence, it results that as soon as the object of the conversion

into personalty was abandoned, these lands became re-invested with all the attributes of real estate.

Let us, then, proceed to examine the arguments presented in favor of the other side.

I.   The first position of Mr. Beckwith is, "that as these lands were partnership property, even after a dissolution, a member of the association would have no right to demand a division, so as to enable him to take his share of the property itself."

In answer to this, I deny the rule alleged, as applied to real estate held in partnership, where the undivided shares are definite; and rely, for the support of my denial, upon the authorities previously adduced under the first division of the discussion.

But if the law were even as stated by the counsel, it would not avail him.   Because Bard declares in the eight several deeds by which, after partition, he conveyed to each beneficiary his divided one-tenth, "that he held in trust for the several beneficiaries their undivided shares of a tenth part for each."   And since the trust was vested in Bard, with the common consent of the beneficiaries, they must, of necessity, have agreed that the property itself should be considered as being potentially divided into shares.   But as Mr. Beckwith argues that partnership property is never so considered, and this was so considered, *ergo*, the counsel himself being judge, this was not partnership property under the Bard trust.

II.   Mr. Beckwith assumes, as the legal rule, "that to re-convert property, there must be an agreement mutually entered into by all the parties in interest, creating such rights and imposing such duties as would effect its conversion, or there must be some unequivocal act which, of itself, operates as a re-conversion."

The counsel cites a number of authorities, not one of which sustains his view; and, singular to say, among the rest, he adduces Adams' Equity, p. 136, where the true rule is laid down with great clearness, as follows: "The duration of the converted character is coincident with that of the trust.   For the conversion originates in the duty of the trustee; and if

the trust be countermanded, either by the exercise of a revoking power of the donor, or the act of those in whom the absolute dominion has vested, the duty is at an end; and the constructive conversion is determined with it. Where the trust is countermanded by the subsequent owners, their act is denominated a re-conversion. And such act must be equally unequivocal with the original trust. It need not, however, be evidenced by an express declaration of change. It is sufficient if the conduct of the party shows an intention to deal with the property in its original, instead of its converted character."

Now apply this formula to the present case, and the problem is solved at once. For why was this property constructively converted? Because it was made the duty of the trustees, Kinzie and Pearson, to sell. But Kinzie and Pearson ceased to be trustees. Their trust was countermanded by the act of the beneficial owners. Therefore, according to Adams, and all the authorities, the constructive conversion was itself determined.

Again, the same property was conveyed to Bard, in trust, to hold for the beneficiaries in definite, though undivided shares, and without any power of sale. But did not this conduct of the parties show an unequivocal intention to deal with the property as real estate held in common, and not as personalty or partnership stock?

III. Mr. Beckwith argues that Bard possessed a power of sale, as to all the lands, because he did, *de facto*, sell some; and the beneficiaries tacitly acquiesced in such sale.

But if the fact were so, would the inference follow? Can the mere doing of an act prove the legal right to do it? And if Bard did sell some of the lands, he must have derived his authority to sell from the direction of the beneficiaries; because he held in trust for them, and they were the real owners in equity.

Besides, if Bard had any power of sale connected originally with the trust, there is no pretense that he exercised it. On the contrary, he made partition of the shares, retaining merely his own and Nicoll's; and we have shown, under the first

division of our argument, that a power of sale which is never exercised, even when arising under the statute of uses, does not operate to defeat the incumbrance of dower. Nor can it be contended that a power of sale delegated by the beneficiaries, would have the effect of an equitable conversion.

Finally, it is believed that the question of dower in both the Bard and Hunter properties, turns upon the single point of equitable conversion. For if these lands were real estate, in the view of a court of equity, at the time when Nicoll transferred his interest, then, most unquestionably, the widow is entitled to her dower; but if they were personalty, her right is cut off.

Let us then apply, as an ultimate test, to each division of the case, the fundamental reason and rule of conversion, as well as re-conversion, which is stated so clearly in Adams' Equity, p. 135: "The doctrine of equitable conversion is embodied in the maxim that 'What ought to be done is considered in equity as done;' and its meaning is, that whenever the holder of property is subject to an equity in respect of it, the court will, as between the parties to the equity, treat the subject-matter as if the equity had been worked out, and as impressed with the character which it would then have borne."

Hence, in the case of the Hunter property, since the declaration of trust shows the intention that partition should be made, the court will consider it as made at the time of such declaration, and the property as thoroughly impressed with its original character of real estate.

The application of the rule to the Bard trust, needs no illustration.

COUNTRY LANDS. It is admitted by the appellee, that the appellant has dower in the country lands; and in respect to them, the learned counsel makes but a single question, namely, that if dower be not decreed in the Chicago property, the court has no jurisdiction over the country lands. In support of this view, the case of *Ralston* v. *Hughes*, 13 Ill. 469, is quoted. But we deem the ruling in that case to be directly the reverse. And it would surely be a strange doctrine to assert that the question of jurisdiction is to be determined by

an adjudication of the merits, and not by the nature of the claim, at least in any case where no endeavor to vest jurisdiction by fraudulent allegation can be charged.

In conclusion, it is urged for the appellee that, at all events, the widow is not entitled to damages for the detention of her dower; because, the demand made for an assignment of dower, in this case, was not such as could be complied with.

We are not certain that we fully comprehend the meaning of this objection. But if the counsel intends to say, that the peculiar condition of the property, caused by the acts of others, and not by any conduct of the appellant, was such as to render the assignment of dower difficult, or even impossible, without the interposition of a court of chancery, or mutual adjustment by the parties, and therefore, that the claim for damages is invalid, it is difficult to imagine upon what principle of legal reason or authority, he predicates the inference.

We omitted to notice, in the proper place, a somewhat vague argument of Mr. Beckwith, "that the appellant cannot have dower, for the reason that the husband never had an equitable seizin in the premises." The counsel takes care not to tell us what an equitable seizin is, but leaves us to infer that it is something very abstruse or mysterious, anything, in fact, capable of defeating dower. What, then, is equitable seizin? The answer is perfectly plain, as well as conclusive in this controversy. "Whenever the trustee is in possession for the benefit of the party lawfully entitled, such party has an equitable seizin of the premises." *Parker* v. *Carter*, 4 Hare, 400 ; *Casborne* v. *Scarf*, 1 Atk. 606 ; Lewin on Trusts, p. 623.

This settles the question. For the trustees, in this case, were undoubtedly in possession, not for their own benefit, but for the benefit of the equitable owners.

C. BECKWITH, for Appellees.

It is not claimed that any right of dower attached to the legal estate vested in Nicoll by virtue of the conveyance from Butler to Nicoll and Bushnell. First, because the legal estate

was held in joint tenancy, and second, because such legal estate was held in trust. The right of dower does not attach to a legal estate held under such circumstances.

The claim of the appellant in regard to the trust half of the Hunter property, is that her husband was seized of an equitable estate of inheritance of six-eighteenths of the property held by him and Bushnell, and that her dower right which attached to it when the conveyance was made, can only be defeated or barred in the manner in which the right of dower in legal estates may be barred or defeated.

The first question arising on this part of the case is, whether Edward A. Nicoll was seized of an equitable estate of inheritance in the property in which the widow now claims dower, by virtue of the deed from Charles Butler to Orsamus Bushnell and himself, dated April 1, 1842, and the declarations of trust, dated April 12, 1842, and April 25, 1842, before the transfer of his interest therein to Abel T. Anderson and Thomas J. Oakley. Nicoll transferred his interest in four-eighteenths of the property to Anderson, May 31, 1842, and his interest in the remaining two-eighteenths to Oakley, September 27, 1842.

The conveyance from Butler was of an undivided half interest, in certain lots, the entire interest in others, and the nominal legal title to certain lots sold to other parties, but not conveyed to them. The declarations of trust had relation backwards to the time of the creation of the trust of which they are evidence, and had the same force and effect as if they had been incorporated into the deed, the trusts of which they declare. The deed and declarations of trust are to be construed as one instrument. The deed of Butler to Nicoll and Bushnell vested in the grantees an absolute and unqualified use and power to dispose of the premises. The declarations of trust not only declare the use, but limit the absolute power of the trustees over such use. They do not operate to enlarge the powers of the grantees over the estate, but to restrain within certain specified limits the exercise of a power before that time absolute and unqualified. The deed, taken in connection with the declarations of trust, vested the legal

estate in Nicoll and Bushnell for the use of Nicoll and his co-*cestuis que trust*, in trust to sell and convey the premises in their discretion, and to make conveyances of the legal title to the parties, of such divided shares of the premises as should be set off to them respectively, whenever partition should be made, so that such conveyances could be executed.

The powers of the trustees are not as clearly defined and explicitly stated in the declaration of trust bearing date the 12th day of April, 1842, as in the subsequent declaration of trust signed by Nicoll and his co-*cestuis que trust*. The first declaration of trust, however, contains an obligation on the part of the trustees to account to the parties in interest for the proceeds of such sales as should be made before partition, and this obligation necessarily involves the power to sell. 1 Sugden on Powers, pp. 118, 134, 135.

It is not material whether a power is given in express terms, or is derived by necessary implication from the language employed, as it is as complete and ample in the one case as in the other. The powers and duties of the trustees, and the nature of the estate held by them, are, however, clearly and explicitly defined in the declaration made by the *cestuis que trust*. It states in the most explicit manner that the trustees were invested with the legal title in trust to make conveyances to each of the parties in interest, of such divided share of the premises as should be set off to them respectively after a partition should be made ; and in the meantime the trustees were invested with full power to sell and convey in their discretion. The trustees were not required to do any act in making the partition contemplated, other than to allow the *cestuis que trust* to use their names when necessary for that purpose ; and they were not to convey to the *cestuis que trust* the legal title to any portion of the premises, until their shares should be ascertained and set off to them. This declaration, it will be borne in mind, was signed by Nicoll, and operated by relation not only upon the legal estate vested in Nicoll and Bushnell, but upon the equitable estate of Nicoll and his co-*cestuis que trust*. The declaration having the same effect as if it had been incorporated into the deed, the nature of the

interest which Nicoll acquired under that deed must be determined by construing the deed and the declaration as parts of one instrument executed at the same time. Hill on Trustees, p. 56, *et seq.*

The relations between the *cestuis que trust* themselves, and between them and the trustees, were, in a legal point of view, fixed by contract at the instant the legal title became vested in the latter, and no one of the *cestuis que trust* had any equitable interest in the property, other than the one limited to him by the terms and conditions of such contract. It provided that the property might be divided between Mr. Butler and the trustees, and then between the *cestuis que trust* themselves; and when these two divisions had been made, so as to separate out the share of each one of the *cestuis que trust*, conveyances might be made to them respectively of such shares. These provisions of the contract were among the principal inducements for entering into it. Before that time the property had had the character of personalty, and none of the parties were entitled to a partition. The character of personalty had been given to the property, in order to obviate the inconveniences that would have otherwise attended the transaction of the business of the adventure, and when the parties in interest assented to a change in its character, they did so only upon condition that the several partitions mentioned should be made before either of the *cestuis que trust* should be entitled to withdraw his share in the character of realty. These provisions of the contract were not only essential for convenience in the transaction of the business, but were necessary to protect the parties from an injury that would have been sustained by vesting in the *cestuis que trust* the legal title to their respective shares, in consequence of the depreciated price for which a small undivided interest must have sold when sold by itself. Under these circumstances neither of the *cestuis que trust* had any right to a conveyance of the legal title to an undivided interest, and such a conveyance could not have been compelled in a court of chancery. The trustees could not have been compelled to have conveyed to one of the *cestuis que trust* his undivided share,

and continued the trust for the other *cestuis que trust.* Hill on Trustees, p. 395; *Goodson* v. *Ellison,* 3 Russ. 593; Hodgson's Settlement, 4 Eng. Law & Eq. 182.

Having ascertained the nature of Nicoll's interest up to the time of his transfer of the same to Anderson and Oakley, the question then arises, whether that interest was an equitable estate within the meaning of our statute. The same requisites are necessary to establish a widow's right to dower in an equitable estate, as are required to establish that right in a legal one. To entitle a widow to dower in a legal estate, her husband must have had a legal estate of inheritance. So to entitle her to dower in an equitable estate, her husband must have had an equitable estate of inheritance. No less equitable estate comes within the meaning of the statute. 1 Scam. 315.

The same principle applies in regard to other requisites that are necessary to establish a widow's right of dower in a legal estate. To establish a right of dower in a legal estate, it is necessary that the widow should show that her husband was seized of the estate during coverture. So to establish the right in an equitable estate, it must be shown that her husband had an equitable seizin during that time. 1 Washburn on Real Property, p. 179; 1 Hilliard on Real Property, p. 102.

The same incidents that would prevent a legal seizin of a legal estate, will prevent an equitable seizin of an equitable estate, and the same acts that would defeat a right of dower in a legal estate, will defeat it in an equitable one. 1 Washburn on Real Property, pp. 174, 181; *Thompson* v. *Thompson,* 1 Jones N. C. (Law) 430.

The right of dower does not attach to a legal estate, where the inheritance is not an entire and vested one. Thus, in *Spangler* v. *Stanler,* 1 Md. Ch. Dec. 36, where the husband was a lessee for forty-nine years, and the lease was renewable forever, and contained covenants on the part of the lessor to convey the fee simple to the lessee, his executors, administrators or assigns, when requested so to do; no request had been made by the husband for a conveyance of the fee simple,

and it was held that the husband had no absolute estate of inheritance vested in him, although he might have procured it upon request, and payment of the expense of a conveyance.

Courts have frequently applied these acknowledged principles, for the purpose of determining what equitable rights were of such a nature as would vest equitable estates so as to entitle a widow to dower in them. In their application it has been determined, first, that where the right is one which a court of chancery would have enforced without the permission of any act on the part of the person having the right, but is one which the husband may waive, relinquish or release, and he has actually waived, relinquished, released, or transferred it, no right of dower attaches.

Thus, in Kentucky, the statute provides, " Where any person, to whose use or in trust for whose benefit another is or shall be seized of lands, tenements or hereditaments, hath or shall have such inheritance in the use or trust as, if it had been a legal right, the husband or wife of such person would thereof have been entitled to curtesy or dower, such husband or wife shall have and hold, and may by the proper remedy in similar cases recover curtesy or dower of such lands, tenements and hereditaments." (See copy of act, 4 Mon. 262.)

In that State, it has been held that dower does not attach to an equitable right to a conveyance under a contract for the purchase of lands, where the purchase money has been fully paid, and where, after such payment, the husband has transferred or relinquished his right. *Hamilton* v. *Hughes*, 6 J. J. Marsh. 582; *Gully* v. *Ray*, 18 B. Mon. 107; *Herron* v. *Williamson*, Litt. Cas. 250.

Second, where the right is one which a court of chancery would have enforced without the performance of any act by the person having the right, and a husband dies seized of it, his wife's right of dower attaches. *Thompson* v. *Thompson*, 1 Jones N. C. (Law) 430; *Banks* v. *Sutton*, 2 P. Wms. 715; *Otway* v. *Hudson*, 2 Vern. 583; 2 Crab on Real Property, 162; *Yeo* v. *Mercerau*, 3 Harris N. J. 387; *Bailey* v. *Duncan*, 4 Mon. 268; *Stevens* v. *Smith*, 4 J. J. Marsh. 67; Washburn on Real Property, 180, 181.

Third, where the right is one which a court of chancery would not have enforced without the performance of some condition precedent, and the person having the right does not perform the condition in his lifetime, his wife's right of dower does not attach.

Thus, in Alabama, where the statute provides, "Where any person to whose use or in trust for whose benefit another is or shall be seized of lands, tenements or hereditaments, hath or shall have such an inheritance in the use or trust as that if it had been a legal right, the husband or wife of such person would thereof have been entitled to curtesy or dower, such husband or wife shall have and hold and may by proper remedy recover curtesy or dower in such lands, tenements or hereditaments," it was held that dower did not attach to an equitable right to a conveyance under a contract for the purchase of lands, where the purchase money had not been fully paid in the lifetime of the husband. *Crabb* v. *Pratt*, 15 Ala. 843.

The same principle has been frequently adopted in other cases, and the uniform rule is, that the husband must have had in his lifetime a complete and perfect right to demand the legal title of him who held it for his use, and have actually demanded such title where such demand was necessary, or his wife's right of dower will not attach. *Spangler* v. *Stanler*, 1 Md. Ch. Dec. 36 ; *Owen* v. *Robbins*, 19 Ill. 545 ; *Pritts* v. *Ritchie*, 29 Benn. St. 71; *Coster* v. *Clarke*, 3 Edw. Ch. 428 ; *Porter* v. *Ewing*, 24 Ill. 617.

Our statute has enlarged the widow's right of dower so as to include those cases where there is no equitable estate, but where the husband dies seized of an equitable right from which a title may be perfected after his decease, by declaring that a widow shall have power "in all real estate of every description contracted for by the husband in his lifetime, the title to which may be completed after his decease."

But it has been repeatedly held, under our statute, that a widow's right to dower does not attach to lands which the husband has contracted to purchase, where he has assigned his contract during his lifetime. *Owen* v. *Robbins*, 19 Ill. 545.

It will be seen that our statute excludes the widow's right of dower in equitable rights to lands which rest in contract in all cases, except where the husband dies possessed of the right, whether such contract is completely performed on the part of the husband or not, and without regard to the reason why the title was not completed in his lifetime. It leaves all rights to lands resting in contract so far free from dower that they may be released or transferred without the concurrence of the wife. The same rule will be found to apply to every species of equitable estate similarly situated. Some trusts are executed by the statute of uses making the equitable estate a legal one, and other trusts are executed by the terms of the instrument under which they are created, so as to pass a perfect equitable title. Chancellor Kent says, "Trusts are of two kinds, executory and executed. A trust is executory when it is to be perfected at a future period by a conveyance or settlement, as in the case of a conveyance to B, in trust to convey to C. It is executed when either the legal estate passes, as in a conveyance to B in trust or for the use of C; or when only the equitable title passes, as in the case of a conveyance to B to the use of C, in trust for D. The trust in this last case is executed in D, though he has not the legal estate." (4 Com. 305.) The distinction between trusts executed and executory, is well settled. Hill on Trustees, p. 328; 1 Lead. Cases in Equity, p. 1; *Edmondson* v. *Dyson*, 2 Kelly (Geo.) 307.

A right of dower cannot attach to an executory trust. The nature of the rights of the beneficiaries under such a trust forbid it. No case can be found where dower has been held to attach to the right of the *cestuis que trust*, when the trust was executory in its nature, for the reason that such a *cestuis que trust* has no vested estate. The beneficiaries under such a trust must take under the trustee, and they cannot take in any other way. *Edmondson* v. *Dyson*, 2 Kelly (Geo.) 307; *Williamson* v. *Berry*, 11 B. Mon. 251.

An equitable estate, within the meaning of the statute in relation to dower, means an estate the legal title to which is vested in one person, and the equitable title vested in another.

At common law, while the husband was entitled to curtesy in a use, the widow was not entitled to dower ; and the object of the statute was to place these different rights on the same basis in regard to the nature of the estates from which they might be derived.   The legislature further provided that the widow should have dower in such other equitable estates, arising from contract, as her husband might die seized of. These two classes of cases are embraced by the statute, in addition to the right of dower at common law, and none others.

In regard to the trust half of the Hunter property, so called, it appears that Nicoll had no right to a conveyance of the legal title of an undivided interest therein, at the time when he transferred his interest to Anderson and Oakley ; and that he never could have compelled such a conveyance in a court of chancery.   His right to a divided interest was one resting in contract dependent upon the performance, by himself and his co-*cestuis que trust*, of certain conditions precedent, which had not been performed.   The contract, it is true, created a trust, but it was of an executory nature, and no equitable estate vested under it.   Under these circumstances, there is neither principle nor precedent to sustain the appellant's claim.

This branch of the case may be further illustrated by a reference to the manner in which William B. Ogden acquired the legal estate of inheritance in the premises.   On the 10th day of April, 1846, Anderson, Johnson, Oakley and the other *cestuis que trust*, or their assigns, sold and conveyed to William B. Ogden all their interest in the property.   By this conveyance, the entire equitable interest in the property became vested in Mr. Ogden, and he then undertook to acquire the legal title.   On the 5th day of November, 1846, Orsamus Bushnell, by deed of that date, remised, released and quit-claimed, unto William B. Ogden, all his right, title and interest in the premises, and all the estate, title, trust, property, etc., as well in law as in equity, of the said Bushnell therein.

At this time, Nicoll had been removed from his office as trustee, and the powers theretofore vested in Nicoll and Bush-

nell jointly, were vested in Bushnell alone. Bushnell had full power and authority to execute the trust. Hill on Trustees, p. 307.

But the legal title still remained in Nicoll and Bushnell. The removal of Nicoll as trustee, did not divest him of the legal estate theretofore vested in him. To vest the entire legal estate in Bushnell, a conveyance from Nicoll was necessary, which had not been ordered by the court, nor executed by Nicoll. Hill on Trustees, p. 196.

The conveyance from Bushnell to Ogden has apt words to make it operate as a conveyance of the entire legal title, in execution of the powers vested in him. The powers of Bushnell might as well have been executed by lease and release, as by any other form of conveyance. 2 Sugden on Powers, p. 10 ; 1 Sugden on Powers, p. 247.

The instrument executing the power need not refer to or take the slightest notice of it, provided the intention to execute the power appears. There are three classes of cases which have been held sufficient to demonstrate the intention to execute a power. First, where there has been some reference to the power in the instrument of execution ; second, where there has been a reference to the property which was the subject on which it was to be executed ; third, where the instrument would have no operation, in whole or in part, except as an execution of the power. 1 Sugden's Vendors, pp. 356, 414, 418; Brightley's Equity, p. 364.

The conveyance from Bushnell to Ogden, could not operate to convey the entire legal estate, unless it operated as an execution of the power. The deed purports to convey the entire legal title to the property conveyed to Ogden by the deed of Charles Butler and others, dated April 10, 1846, and any construction that would defeat its operation as an execution of the power, would make it only operative to convey an undivided half of such title, which would be manifestly contrary to the intention of the parties. It will be borne in mind that Bushnell had no interest whatever in the property. An instrument operates as an execution of a power, or not, according to the intention of the parties, but is never construed so

as to operate against their intentions.    1 Sugden on Powers, 421.

And if the deed from Bushnell did not operate as an execution of the powers vested in him, it had no operation whatever.    It was probably some considerations of this nature which led to the execution of the further deed from Bushnell to Ogden on the 1st day of November, 1858, after Nicoll's death, and when the entire legal estate became vested in Bushnell as his survivor, unless such estate had passed to Ogden by virtue of the first deed from Bushnell.    The deed last mentioned is a perfect and complete execution of the powers vested in Bushnell.

The effect of the execution of the powers vested in Bushnell will be briefly noticed.    His power to convey the respective shares, after partition had been made and such shares set out to the several parties in interest, or to such person or persons as they might severally appoint, might well be executed before partition was made where all the interests were united in one person.    His power to sell might be exercised for the purpose of enabling the person entitled to the proceeds to realize them by the acquisition of an absolute title to the property.    The execution of either of these powers defeated not only the legal estate vested in Nicoll and Bushnell, but all the uses, trusts and rights declared under it.    From that moment they become completely and effectually blotted out of existence.

As soon as the power granted or reserved in the instrument settling an estate is exercised, by changing the old and appointing other uses to which the grantee is to stand seized, the estate of the grantor is drawn to the new uses as soon as they arise, by means of the power and the statute which executes the possession.    An appointment under a power operates to substitute one *cestui que use* for another, or to substitute new uses for the old ones in the same *cestui que use.* 4 Kent's Com., p. 316.

The rule as to the manner in which the execution of a power operates upon an estate, is, that the vendee under a power takes in the same manner as if the estate had been ex-

24

pressly limited to him by the instrument creating the power. 2 Coke Litt., p. 272 *a*, note vii, 2.

Immediately upon the execution of the power, all intermediate uses and estates are defeated and destroyed; and the estates limited under the power take effect from the time of its execution, in the same manner as if they had been granted in the deed creating the power in the place of the uses and estates defeated. Sugden on Vendors, p. 31; *Maundrell* v. *Maundrell*, 10 Ves. 255.

After Bushnell became sole trustee, his grantee took the estate as if it had been limited to him in the original deed from Butler by express terms, and all intermediate estates were thereby destroyed. The effect of the destruction of intermediate estates by the exercise of a power upon derivative estates, is well settled.

Thus a mortgage upon an intermediate estate is defeated by the exercise of a power which destroys the estate. 2 Chance on Powers, pp. 25, 28.

So the lien of a judgment against a party in whom the intermediate estate is vested, is destroyed by the destruction of the estate. 2 Sugden on Powers, p. 33.

All partial charges upon, or interests out of the intermediate estate, are defeated by the exercise of a power which destroys that estate. 2 Chance on Powers, p. 25.

Thus, in the common case of a power of sale given to executors, where the heir dies seized before the execution of the power, leaving a wife entitled to dower, the execution of the power not only defeats the charges of the heir upon the estate, but his wife's right of dower. 2 Chance on Powers, p. 28.

Dower is a derivative estate, and when the estate of the husband ceases, the wife's right of dower is defeated. *Cessante statu primitivo cessat atque derivitatus,* is a maxim of the law.

Upon this principle the widow is not entitled to dower when the seizin of the husband is defeated by a condition annexed to the grant; for if the donor enter for breach of the condition, the estate of the husband is thereby extinguished. The donor

is in his original estate, which defeats all rights which attached to the intermediate seizin of the husband. Coke Litt., pp. 201, 202 ; 4 Kent's Com., p. 49.

The effect of the destruction of the husband's estate by the exercise of a power, upon the wife's right of dower, is not an open question at this day. It has been settled by the highest authority, and become the text of the most approved authors, that the wife's dower in such cases is defeated. *Moreton* v. *Lees*, cited in 2 Sug. on Pow., p. 32 ; *Ray* v. *Pung*, 5 Barn. & Adol. 561 ; S. C., 5 Madd. 310 ; 2 Chance on Powers, p. 27 ; 2 Sugden on Powers, p. 33 ; 1 Bright's Husband and Wife, p. 518 ; 4 Kent's Com., p. 51.

As before remarked, the trust vested in Bushnell was an executory one. The difference between an executory trust and an executed one, is, that in the former, some further act is necessary to be done by the author of the trust or the trustees to give it effect ; as where property is vested in trustees to convey to others, a conveyance from the trustees is required to vest the title in the *cestuis que trust ;* while in the latter, no act is required to be done to give it effect. " This something to be done," said Mr. Justice Nisbet, in *Edmondson* v. *Dyson*, 3 Kelly, 307, " is the grand criterion for a correct determination whether a trust is or is not executory." The limitations may be complete, and there may be no doubt as to the quantity or quality of the estate to be conveyed. The thing to be done, to wit, to convey, may neither restrict nor enlarge the estate of the *cestui que trust*, and yet the very act of conveying is the test of an executory trust. *Wood* v. *Burnham*, 6 Paige, 514 ; S. C., 26 Wend. 9 ; *Wiley, Parish & Co.* v. *Smith*, 2 Kelly, 320 ; 1 Am. Lead. Cases in Equity, p. 45 ; *Berry* v. *Williamson*, 11 B. Mon. 245.

The effect given to these two species of trusts is widely different. The effect given to an executed trust is to vest in the *cestui que trust* an equitable estate, but no estate whatever is vested in the *cestui que trust* by an executory trust. The difference is, that in the first case the donor or grantor is his own conveyancer, and the *cestui que trust* takes directly ; and in the second he makes his trustee his conveyancer, and the *cestui que trust* takes by force of the deed of the trustee.

In *Edmondson* v. *Dyson*, Mrs. R., by will, devised her whole estate to D., in trust for the sole and exclusive use of her husband during his natural life, and directed that, at his death, the trustee should convey the property devised in trust to such person absolutely as the husband should by will appoint, and if he should die intestate, then, that the trustee should convey all the property to the heir or heirs-at-law of the husband; and the trustee was further authorized, with the husband's consent, to sell all or any part of the property at such time and on such terms as he might think best, and to invest the proceeds in such manner as he might think most for the husband's interest, first having the latter's consent. The husband died intestate, and the question arose whether the child of the husband took as purchaser under Mrs. R.'s will, or whether the whole estate vested in the husband, and his child took as his heir by descent. It was held that the child took by force of the deed of the trustee as purchaser under the will.

So in *Berry* v. *Williamson*, the donor by deed conveyed certain lands to a trustee to be divided into lots and sold by him, as soon and on such terms as he might deem expedient. The funds arising from such sales were to be invested by the trustee in such productive property in Cincinnati, Newport or Covington as the three daughters of the grantor might desire to have purchased, each of them to have the direction of the investment of one-third of said funds; and the trustee was to convey to the daughters respectively the property in which investments might be made of their respective shares of the funds, to have and to hold the same during their respective lives, with remainder to their respective heirs. If either of the daughters desired to retain her portion of the lands conveyed to the trustee, and not to sell the same, then the trustee was directed to make a fair and equitable division of the lots among the daughters, and sell the same at such time as they might respectively direct, or convey the same to each of them respectively, to have and to hold the same during their natural lives respectively, with remainder to their respective heirs. Two of the daughters claimed to have the property in which investments had been made of their respective shares of the

funds, and their respective shares of the unsold lots, conveyed to them respectively, in fee simple. The court admitted that if the trust had been an executed one, a fee simple equitable title would have vested in the daughters, in accordance with the rule in Shelley's case.

But it was held, as the trust was an executory one, no estate, either legal or equitable, was vested in the daughters. In regard to the unsold lots, the court held, that until a division of them was made, the daughters had no vested equitable estate in their respective shares, and that when such division should be made, a conveyance would be necessary to vest such estate.

It is insisted by the appellant's counsel, that the first deed from Bushnell to Ogden operated as a release, but it will be seen that Ogden had no vested equitable estate, and the deed could not operate as a release. A release, as such, is void when made to one who has no vested estate for it to work upon. Blackstone says: " If there be a lessee for years, and before he enters and is in possession, the lessor releases to him all his right in the reversion, such release is void for want of possession in the releasee." 2 Com. 325.

Undoubtedly, in the case mentioned by Blackstone, the lessee has an equity before he takes possession, but he has no vested estate. It is for the reason that the beneficiaries have no vested estate in an executory trust, that all conveyances by the trustee to them operate as an execution of the trust. There is no other mode in which they can operate, and hence we find the rule uniformly laid down that the beneficiaries in such a trust, take through the deed of the trustee.

From what has already been said, it is apparent that Ogden took the estate through the deed of Bushnell as trustee, and through that deed alone. The beneficial interest of the *cestuis que trust* was not enlarged into a vested legal estate, but the execution of that deed defeated the old uses, and substituted new ones. Mr. Ogden's title is now held, in contemplation of law, directly under Mr. Butler. The equity in which the appellant claims dower being defeated, her claim is also defeated.

The second parcel of lands in which the appellant claims dower, is called the "Bard Trust property." The facts in regard to this parcel are, that on the 20th day of April, 1835, John H. Kinzie and Hiram Pearson, parties of the one part, and William Bard, John Ward, J. S. Joseph & Co., Isaac Carew, J. Delafield, Edward A. Nicoll, Charles Butler, Beverly Robinson, Thomas W. Olcott, and N. T. Bloodgood, parties of the other part, entered into an agreement for the purchase and sale of lands in Illinois, the adjacent parts of Indiana, and in the then territories of Michigan and Wisconsin. The parties of the second part were to advance to the parties of the first part, Kinzie and Pearson, the sum of fifty thousand dollars for the purposes of the adventure, which was to be invested from time to time by the parties of the first part, in such lands as they might think proper.

The parties of the first part were invested with power to sell or dispose of and convey the lands purchased, for cash or on credit in their discretion, and might exchange them for other lands. The proceeds of the lands sold were, until July 1, 1839, to be invested by the parties of the first part in other lands in their discretion, and they had like powers of sale and of exchange in regard to all lands acquired with the proceeds of sales or received in exchange. The title to all lands acquired for the purposes of the adventure, was to be taken in the joint names of the parties of the first part, and held by them in trust for the benefit of all the parties, respectively, according to their respective interests therein.

The parties of the first part were to make no charge for their time, services, or expenses in the business relating to the adventure. They were from time to time to furnish to Charles Butler, for the parties of the second part, schedules of all lands acquired for the purposes of the adventure, giving a description of the lands and stating the amount of the purchase money, and in whose name the title thereto had been taken. These schedules were to be signed by the parties of the first part, and were to declare that the premises had been purchased under the agreement before mentioned, and that the title thereto was held for the uses and purposes of the

same, and which schedules were to be taken as a part of the agreement. The adventure was to continue until the first day of July, 1840, but no new purchases of land were to be made after July 1, 1839.

' At the expiration of five years from July 1, 1835, the adventure was to be closed, and all lands acquired for the purposes of the adventure, were, from time to time, and within that time, if practicable, to be sold, and the proceeds realized in money ; and as the proceeds were realized in money, the sums advanced by the parties of the second part respectively, were to be refunded to them respectively, with interest on the same at the rate of seven per cent. per annum, payable annually on the first day of July in each year, from the time when such advances were made.

After the advances and the interest thereon were refunded, the profits of the adventure, after deducting all taxes, assessments, expenses of surveys and disbursements, other than the personal expenses of Kinzie and Pearson, were to be divided into two equal parts between the parties of the first and second parts ; and the one of said parts was to be divided and distributed equally between the parties of the first part, and the other of said parts was to be divided and distributed equally between the parties of the second part. Any losses that might be sustained were to be borne by the parties according to their respective interests in the profits.

The parties of the first part entered into a bond to Charles Butler, dated April 20, 1835, in the penal sum of eighty thousand dollars, conditioned for the faithful performance by them of their part of the agreement above mentioned. In May and June, 1835, the parties of the second part advanced, for the purposes of the adventure, the sum of $50,025.05, and on the first day of July, 1835, the parties of the first part made the required schedule of the lands acquired, showing that all the moneys advanced had been invested.

On the 26th day of July, 1841, Kinzie and Pearson, by their deed of that date, absolute on its face, in consideration of the sum of five hundred and fifty dollars, and of the cancelment of their bond and contract with Charles Butler, William

Bard, and others, dated April 20, 1835, conveyed to William Bard all of the property held by said Kinzie and Pearson for the purposes of the adventure, subject to the payment of four hundred dollars, being the amount of the drafts of Charles Butler on William Bard, payable three months after the date of said deed. The property conveyed by this deed is called the " Bard Trust property."

On the same 26th day of July, 1841, Kinzie and Pearson entered into an agreement, signed by them and Charles Butler acting for himself and others, which recites that said Kinzie and Pearson had executed a bond and contract, copies whereof were thereunto annexed, which are the same before mentioned, and that they had that day, for the consideration of five hundred and fifty dollars, conveyed the premises purchased by them to William Bard, at the request and for the benefit of the parties interested in said contract, who advanced the purchase money therefor; and they had, for said consideration, agreed to assign, release and convey all their interest in said contract to the said William Bard, and the said bond and contract were to be canceled, and the said Kinzie and Pearson entirely released and discharged therefrom. The agreement, in consideration of the said sum of five hundred and fifty dollars, and also in consideration of the cancelment and discharge of the liabilities of said Kinzie and Pearson, under and by reason of said bond and contract, releases, assigns and conveys all the interest of said Kinzie and Pearson in said contract to said William Bard and his assigns, thereby vesting him abso- lutely with all their rights and interest therein, with full power and authority to discharge and cancel the same, and to do therewith as he might think fit.

Edward A. Nicoll transferred his interest in the adventure to Abel T. Anderson on the 23rd day of December, 1842, by deed of that date, and Abel T. Anderson, on the 6th day of February, 1843, conveyed to William Bard in trust for the New York Life Insurance and Trust Company, all the interest in said adventure that he acquired from Nicoll under the deed from him.

From July 26, 1841, up to March, 1843, William Bard paid

the taxes upon the property, the expenses incident to its care and management, sold and conveyed some of the lots, and made partition between himself and other parties of certain lands held in common between them.  In March, 1843, the remainder of the property of the adventure, including all that had not been sold and conveyed by Bard, or conveyed by him in partitions made with other parties, was divided by mutual agreement between the several parties in interest.  These parties were then ten in number, and the property was divided into ten separate parcels and of as nea.- an equal value as it was practicable to make them.  The lands divided in this partition taken from the lands conveyed to Bard by Kinzie and Pearson, will show the lands that had been disposed of by Bard before the partition was made.

On the first day of August, 1843, William Bard executed eight several deeds to eight of the several parties interested in the adventure or to their assigns, thereby conveying to them respectively the divided shares of said property set off to them respectively in the partition made as above stated in March, 1843.  The share set off to Bard in his own right, and the share set off to him in trust for the New York Life Insurance and Trust Company, were not conveyed at that time. These deeds recited that Kinzie and Pearson had, by deed dated July 26, 1841, conveyed certain lands and premises to said Bard, and that said deed, although absolute in terms, was made to the said Bard in trust for the several persons and parties who were the owners of said premises, that is to say: for himself and in his own right, one-tenth part thereof; for Isaac Carow, John Ward and Thomas W. Olcott, each one-tenth part thereof; for the assignees of Edward A. Nicoll, one-tenth part thereof; for Benjamin F. Butler, assignee of Charles Butler, and Thomas Suffern, assignee of N. Bloodgood, each one-tenth part thereof; for the assignees of John Delafield and the assignees of Joseph S. Joseph & Co., each one-tenth part thereof; and for Beverly Robinson, one-tenth part thereof.  The deeds further recited that said premises had been allotted and divided into ten equal parts as nearly as could be, quantity and quality relatively considered, at the

request of the owners thereof, and that the same had been divided among the proprietors by lot, and upon such division the premises described in each of said deeds were allotted and set off to the grantee therein named, as his share of the premises in severalty; and that the grantee named in said deeds respectively had accepted thereof as his full share of said premises; and that said William Bard had been requested by all the parties in interest to convey the same in severalty in fee to the grantees therein named respectively.

On the 26th day of October, 1846, William Bard conveyed to William B. Ogden, the premises set off to him in trust for the New York Life Insurance and Trust Company on account of the share in the adventure formerly owned by Nicoll. The defendant, William B. Ogden, derives his title to the premises under that deed, and the other defendants derive their title under him.

The claim of the appellant to dower in the "Bard Trust property," depends in part upon principles somewhat different from those heretofore considered. The appellant claims that her husband became *seized* of an equitable estate of inheritance in the property, before he transferred his interest therein to Anderson on the 23rd day of December, 1842. The principle is so well settled that where real estate is purchased with partnership capital, and for the purposes of partnership trade, it will, even in the absence of any express agreement, be considered as absolutely converted into personalty, and may be transferred as such, that the appellant does not claim that her right of dower attached until July 26, 1841, when Kinzie and Pearson conveyed to Bard. Up to that time there was an *express* agreement that the lands acquired for the purposes of the adventure should have the character of personalty. The parties interested, or the beneficiaries of the trust, were not to take their interests in lands, but they were to take the proceeds of the lands upon a sale and conversion into money. The moment that agreement was entered into, the subject of it, though land, received the impress of money, and is afterwards to be considered as money, unless the parties, before the transfer of Nicoll's interest to

Anderson, mutually agreed to treat and regard it as land. No agreement after that time can have any effect upon the question now presented for consideration. The right of dower must have attached before Nicoll's transfer, or it never attached. It is therefore incumbent upon the appellant to show an agreement mutually entered into between all the parties in interest, by which the property was re-converted into realty before her husband parted with his interest therein. *Coster* v. *Clarke*, 3 Edw. Ch. 428; Adams' Equity, pp. 135, 137, 245.

It is insisted, by the appellant's counsel, that such re-conversion took place by the deed of Kinzie and Pearson to Bard on the 26th day of July, 1841, and the declaration showing for what purposes that deed was made. The question under consideration will be to some extent relieved from embarrassment, by ascertaining the true nature of Kinzie and Pearson's interest before the transfer of it was made by them. They had no interest whatever in the capital of the adventure. They furnished none of it, and were not liable to contribute to the other parties for its loss. The agreement between the parties expressly made all the property of the adventure chargeable with the repayment of the capital and the interest thereon, and provided that all of the proceeds should be devoted to that purpose until it was accomplished. There were to be no profits until the capital and the interest thereon was refunded. Kinzie and Pearson were only to have a share of the profits. They were not partners with the other parties, but were mere agents, who were to receive a share of the profits for their services. *Denny* v. *Cabot*, 6 Met. 92; *Turner* v. *Bissell*, 14 Pick. 192; *Loomis* v. *Marshall*, 12 Conn. 69; *Tobias* v. *Blin*, 21 Verm. 544; *Dwinel* v. *Stone*, 30 Maine, 384.

The mere agents held the legal title to the property in trust to sell the same and divide the proceeds. The agents were paid for their services and discharged. These acts did not change the nature of the property held by them. The impression of personalty that had been placed upon it by agreement, could only be removed by a new agreement that it should be so removed. The transfer of the property by Kinzie and

Pearson to Bard, was a transfer of it upon the same trusts and with the same character as it was held before the transfer was made. It is true that the transfer was made at the request and for the benefit of the parties interested in the contract, who advanced the purchase money therefor; but this affords no evidence that the parties mutually agreed to change the nature of the trusts or the character of the property. It is true that the parties interested settled with their agents for their services, and discharged them; but these acts had no relation to the character in which the property should thereafter be held.

One parcel of the property transferred had been sold by contract to Messrs. Garland and Dyer, and the transfer was made subject to that contract. Upon the payment or tender of the money stipulated to be paid by that contract, Bard was bound to convey that parcel to the purchasers. The money was to be divided between the parties in interest. The appellant is therefore obliged to claim that the agreement which she seeks to establish by implication, was one to re-convert a part of the property, and leave the remainder with the same character that it had before that time. Again, the property was transferred subject to a lien of four hundred dollars specified in the drafts of Charles Butler upon William Bard; and it cannot be supposed that Bard was to have no right to reimburse himself out of the proceeds, for the money to be paid upon those drafts. As will be seen hereafter, the true rule in regard to re-conversion is, that there must be such an agreement as would operate as an equitable conversion of property, or there must be some act which of itself operates as a re-conversion.

It may be insisted, that the true construction of the agreement between Kinzie and Pearson and the other parties made the former, partners and not the mere agents of the latter; but as the same results would follow from the one relation as from the other, further discussion of that point is unnecessary. If all the parties were partners, then the remaining partners succeeded to the rights of the retiring ones. The nature of the rights of the remaining partners was not changed by the

retirement of two of the original members of the firm. By the succession to the rights of the retiring partners, the quantity of the rights of the remaining partners might have been enlarged, but the quality of those rights was in no respect changed. And it may be conceded that the copartnership was dissolved by the retirement of two of its members, or by the effluxion of time, and the same results would follow.

A partner after a dissolution has no right to have the copartnership property divided, so as to enable him to take his share of the property itself. The contract between partners is not for a share of the property, but for a share of its proceeds. The parties of the second part to the agreement of April 20, 1835, were, undoubtedly, partners as between themselves; and their express contract that neither of them should have any right to a share of the copartnership property itself, and only have a right to a share of its proceeds, remained in full force until all parties entered into a valid agreement to divide the property. Collyer on Partnership, p. 275 *et seq.* 278; *Featherstonhaugh* v. *Fenwick*, 19 Ves. 298; *Wilson* v. *Greenwood*, 1 Swanst. 471; *Cook* v. *Collingridge*, 3 Jacob, 607; *Sigourney* v. *Munn*, 7 Conn. 11, 324; *Conwell* v. *Sandidge*, 8 Dana, 278; *Evans* v. *Evans*, 9 Paige, 178; *Fereday* v. *Wightwick*, 1 Tamlyn, 261; 3 Kent's Com., p. 64; *Rigden* v. *Pierce*, 6 Madd. 353; *Pierce* v. *Trigg*, 10 Leigh. 406.

Where the business of a copartnership is continued after an act which would entitle either of the partners to a dissolution, or after the partnership is dissolved by effluxion of time without any express agreement as to the powers, rights and duties of the partners, the law implies an agreement, and infuses into it the old covenants between the parties, and thus defines their powers, rights, and duties. Story on Part., secs. 197, 198, 278, 279; 1 Molloy, 466; 17 Serg. & R. 165; 16 Vt. 613; 5 Mason, 185.

Thus it will be seen that the law implied an agreement that Bard should hold the property upon the same trusts, with the same character of personalty impressed upon it, and with the same powers of sale as it was held before it was transferred to him. The law imposed upon Bard the duty of sell-

ing and disposing of the property and dividing the proceeds, and secured to his copartners the right to have it done.

The acts of Bard were in accordance with this view of the law. He at once assumed the powers theretofore exercised by Kinzie and Pearson, and proceeded to sell and dispose of portions of the property, to receive the proceeds of such sales, to make partition of other portions held in common by himself and other parties, to pay taxes and to make necessary improvements and employ agents for its care and management. The acts of the parties as well as the law forbid the implication of an agreement to change the character of the property from personalty to realty.

The recitals in the deeds from Bard to his several copartners, dated Aug. 1, 1843, were made after Nicoll had parted with his interest, and it is doubtful whether they are competent evidence; but if they are admissible as the declarations of Bard, they are not inconsistent with the view that I have taken of the case. They simply state that although the conveyance from Kinzie and Pearson to him was absolute in terms, yet it was made in trust for the several persons and parties who were the owners of the premises, naming them. The recitals do not state that the deed of Kinzie and Pearson was made with any intention to change the character of the property from personalty to realty, nor the nature of the powers and duties to be exercised by Bard in carrying out the trust reposed in him.

It is, however, insisted that the property became re-converted from personalty to realty some time in the year 1842, in pursuance of some vague understanding between the parties in interest that it should be divided. As before remarked, to re-convert property, there must be an agreement mutually entered into by all the parties in interest, creating such rights and imposing such duties as would effect its conversion, or there must be some unequivocal act which of itself operates as a re-conversion. A mere declaration that the property shall be considered as re-converted is immaterial, for it is not the declaration, but the duty to re-convert which creates the equitable change. Adams' Equity, p. 136; *Thornton* v. *Hawley,*

10 Ves. 129; *Polley* v. *Seymour*, 2 Y. & C. 708; *Cookson* v. *Cookson*, 12 Cl. & F. 121; *Attorney General* v. *Mangles*, 5 M. & W. 128.

The duration of the converted character of the property is coincident with that of the trust. So long, therefore, as Bard had the power to sell any portion of the property, its converted character continued. An agreement having the effect of a re-conversion must have absolutely abrogated Bard's powers of sale. It is not pretended that there was anything more than an understanding between the parties, that it was not expedient to exercise the power any further than was necessary to carry out existing contracts, as they contemplated a division of the property. As has been already remarked, an understanding having the effect to annul Bard's power of sale, must have been one binding upon all parties interested. Bard's powers could not be annulled and revived from day to day, by an understanding resting in parol. There must have been at least such an agreement as a court of chancery would have enforced; an agreement in writing or a verbal one with such acts done under it as would have taken it out of the statute of frauds. The agreement must have been one leaving no discretion in Bard, and imperatively requiring him to divide the property and the whole of it, and convey to the parties interested their respective shares in accordance with such division. So long as it remained uncertain how much of the property was to be divided, the understanding was incomplete. The property held in common with other parties, it is conceded, was to be divided as it then stood, or after a partition had been made between such parties and Bard at his discretion. The lands at St. Joseph, Michigan, which were a part of the investment, do not appear to have been divided. It is evident that no such agreement was entered into by the parties as had the effect of re-converting the character of the property.

It might be admitted, for the purpose of argument, that the character of the property was re-converted from personalty to realty before the transfer of Nicoll's interest, and still the appellant would have no right of dower therein. Bard

as trustee, undoubtedly had some duties to perform. He was to collect the money due, or to become due, from Garland and Dyer, and make a conveyance of the property sold them. He was to pay the taxes, and reimburse himself out of the proceeds of the sales for the sum of four hundred dollars. He was to make partition of portions of the property held in common by himself and other parties, and it may fairly be inferred that if partition was contemplated between the parties in interest, that he was to be more or less instrumental in making it.

Under these circumstances it is evident that that statute of uses did not vest the legal title in the *cestuis que use;* neither was it executed by the terms of any agreement limiting the uses. The most liberal construction for the appellant in regard to the rights of the *cestuis que trust*, would only create an executory trust in Bard. There was something to be done before the title was to vest in the *cestuis que trust.* It was never contemplated that the title should vest in them as tenants in common, and no agreement can be inferred or implied directly contrary to the manifest intentions of the parties. The acts and declarations of the parties in regard to a partition conclusively show that by common consent the *cestuis que trust* were not to take undivided interests in the property, and so long as there was something to be done before they were to take the several interests which they were thereafter to hold in their own right in severalty, no estate vested in them on which a right of dower could attach. The acts to be done before the *cestuis que trust* were to take the estates, that they were thereafter to hold in severalty, were in the nature of things precedent, and until they were actually done, the estate did not vest, and the *cestuis que trust* were not seized of them. These considerations dispose of the appellant's claim to dower in the " Bard Trust property."

The third parcel of property in which the appellant claims dower consists of certain lands situated in La Salle, Will and Grundy counties. During the coverture of the appellant, Nicoll was the owner of these lands in fee simple, and on the 23rd day of December, 1842, he conveyed them to Abel T.

Anderson, through whom the defendants derive their title. No objection is made to the claim of the appellant to dower in these lands, but it is insisted that the Circuit Court of Cook county had no jurisdiction to set out her dower therein. The statute directs that proceedings to recover dower shall be in a county in which some of the lands lie. Revised Statutes of 1845, title "Dower," sec. 26.

The appellant having no right of dower to lands in Cook county, her bill cannot be sustained for the purpose of setting out her dower in lands lying in La Salle, Will and Grundy counties. *Ralston* v. *Hughes*, 13 Ill. 469.

The bill seeks to recover damages for the non-assignment of dower. The death of Mr. Nicoll is only established by the presumption arising from the lapse of time since he has been heard from. It is not pretended that purchasers from Nicoll were under any obligation to set out dower to his widow until she demanded it. The demand to be effectual must be such an one as the party of whom it was made could comply with. The demand upon William B. Ogden in this case, was of lands which he did not own, and of lands which he owned jointly with others, and which he had no power to comply with. While it is not insisted that a demand before the commencement of suit is necessary to recover dower, yet it is necessary that there should be such a demand to enable the dowress to recover damages for its non-assignment, and the demand must be so made that the owners of the land can comply with it.

CATON, C. J. We shall first consider the claim to dower in the intestate's interest in the trust half of the Hunter property. This must depend upon the character of the title or right to that interest at the time of his conveyance of it, or at any time previous.

A few plain propositions may be stated, about which there is no dispute. In order to entitle the widow to dower in this property, the husband must, at some time during coverture, have been seized of an equitable estate of inheritance in the property. That is, an equitable title to this property must

have presently existed in him, which title, had he died at the moment, would have descended to his heirs-at-law as real estate, instead of going to his personal representatives as a chattel interest or chose in action. Again, it is agreed on all hands, that while the title to the property remained in Butler, the first trustee, the whole title to it as land, both legal and equitable, was in him, and the *cestuis que trust* had only a right to its avails or proceeds. During that time, their right was a personal right—it was personal property, and would not descend to their heirs. This was made so by the express agreement of the parties. They were partners in a speculating enterprise, and this property constituted their stock in trade; and in such a case, there is no dispute that the character of personalty is stamped upon the property for the purpose of fixing the character of the interests of the several partners, although it was in truth real estate. Again, there is no dispute made that it was competent for the parties in interest, at any time they chose, to change the character of their interest in this property, from that of a personal right to the proceeds of it, to an equitable title to it. They could, in other words, divest this property of its artificial character of personal property, and change it back to its original and natural character of real estate. If this was done at any time, then the property became a hereditament; it was an estate of inheritance, and descended to the heir, simply because it had become real estate and had ceased to be personal property. And if this was done, there is still the question to be considered, was the equitable title to this property vested in the husband?—was he seized of this equitable estate, or did something remain to be done by him, or the *cestuis que trust*, or the trustee, or any one else, before this equitable title was vested in him, or, to express it differently, before his right to it was complete? If the character of this property was so changed, and the title to it so vested in the *cestuis que trust*, it was done either by the conveyance from Butler to Bushnell and Nicoll, or in the declaration of trust which they made on the 12th of April, 1842, or by the specifications of the purposes of the trust made by the *cestuis que trust* on the 25th of the same month

Upon the true meaning and legal construction of these instruments this branch of the case entirely depends. The first is a deed from Butler to Bushnell and Nicoll as joint tenants, and not as tenants in common, and describes them as trustees. With these exceptions, it is an ordinary conveyance, without any specification of the trusts subject to which they were to hold the property. These were first stated by the trustees by the declaration of 12th of April, 1842, twelve days after the date of the deed, and are in these words:

"Whereas, Charles Butler, of the city of New York, has, by deed dated April 1, 1842, duly executed by the said Charles Butler and Eliza A., his wife, conveyed to us, E. A. Nicoll and O. Bushnell, certain real estate, situate, lying and being in the city of Chicago, that is to say, the undivided half part of certain lots, pieces and parcels of land, being the whole of the lots remaining unsold of the Hunter property so called, reference being had to the said deed will more fully appear; and whereas, the said premises have been conveyed to us in trust for certain purposes, that is to say, we hold the same in trust for Edward A. Nicoll, who is entitled to six-eighteenth parts thereof, the whole being divided into eighteen parts; Charles Butler, in trust for the assignees of Simeon Hyde, four-eighteenth parts thereof; John S. Bussing, of the city of New York, two-eighteenth parts thereof; Chester Clark, of the same place, two-eighteenth parts thereof; Benjamin F. Butler, one-eighteenth part thereof; William B. Ogden, one-eighteenth part thereof; and Barton White, of White Plains, Dutchess county, two-eighteenth parts thereof; and whenever partition shall be made of said premises among the said parties in interest, we shall and will convey to each of the persons before named, his heirs and assigns, or to such person or persons as he or they shall or may designate to receive the same, his part or share of said premises in severalty by deed with covenants of warranty against our own acts only; and partition thereof shall be made, if practicable, within six months from the date hereof; and if before the partition and conveyance of said premises, or any part thereof, as aforesaid, any of the same shall be sold, we shall and will account for

the proceeds of said sales to the parties aforesaid, according
to their respective rights and shares, first paying all the ex-
penses, charges, taxes, assessments, etc., incident to the care
and management of the said property and the execution of
this trust; but it is not expected or required of us, the said
trustees, that we, or either of us, shall go to Chicago for the
purpose of effecting a partition of said premises; and it is
understood and agreed that we are to be liable as trustees only,
severally, and not jointly, for so much money as may come
into our hands severally and respectively.

   " Witness our hands and seals, this April 12, 1842.

              (Signed)                     ED'D A. NICOLL.      [SEAL.]
                                           ORSAMUS BUSHNELL.    [SEAL.]"

   This first declares absolutely that they hold, in trust for
Nicoll, the husband of the petitioner, one-third of the prop-
erty, and in the same way naming the other *cestuis que trust*,
and specifying the interests of each.   Had this declaration
stopped there, it would have left it as a simple and ordinary
case of trust, in which two trustees hold the legal title to land
for eight *cestuis que trust*, owning the equitable interests as
tenants in common in different proportions, and upon them
would have devolved the simple duty of performing the trust
by the conveyance of the legal title to the *cestuis que trust*,
either by one deed, specifying the interest of each, or by sep-
arate deeds to each, of his undivided portion.   We say, had
the declaration stopped there, such would have been the duties
of the trustees and such the rights of the beneficiaries.   But
it did not stop there; it proceeded to impose other and addi-
tional duties upon the trustees.   It further provides, that
whenever partition shall be made of the premises, they will
deed in severalty to each, the separate portion set off to him.
Was this clause a limitation of the rights of the beneficiaries
and of the duties of the trustees, as to any of those rights and
duties, and providing others in their stead, or, was it an en-
largement of those rights and duties, leaving those which
existed without this clause still in force?   The same inquiry
may be made in reference to the next specification of duty,
which is, that if any of the property shall be sold before par-

tition, they, the trustees, will account for the proceeds to the respective parties, in proportion to their respective rights. Here is an implied duty on the part of the trustees to convey the property thus sold, to the purchasers, as well as to account for the proceeds. By whom were these sales to be made? Not by the trustees, for they had as yet no right to sell the property of their beneficiaries in this, more than a trustee who holds a title to real estate in trust for another has a right to sell it, without authority from the *cestuis que trust*. These sales, then, were to be made by the *cestuis que trust*, and in the event of such sales the trustees assumed the duty of receiving and distributing the proceeds. Now, did the assumption of these duties take away or limit the right of the *cestuis que trust*, to have the property conveyed to them as tenants in common, should they at any time desire to have that done? Or did it relieve the trustees from the duty of so conveying at the election of the *cestuis que trust?* We think not. While the trustees might voluntarily assume new duties, they could not throw off and relieve themselves from old ones. Such we understand to be the legal effect of this declaration of trust by the trustees.

On the 25th of April, 1842, the *cestuis que trust* made the following specification of the trusts assumed by the trustees :

"KNOW ALL MEN BY THESE PRESENTS, That whereas, Charles Butler, of the city of New York, counselor at law, and Eliza A., his wife, did, by an indenture bearing date the first day of April, in the year of our Lord one thousand eight hundred and forty-two, at the request of us, the undersigned, convey to Edward A. Nicoll and Orsamus Bushnell, of said city, the following pieces, parcels and lots of land, that is to say :"

[Then follows a description of the land, when the instrument proceeds] :

"Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof—as by the said indenture will more fully appear, reference being thereunto had; to have and to hold the same to the said Edward A.

Nicoll and Orsamus Bushnell, and the survivor, and the executors, administrators and assigns of such survivor, upon the trust, however, expressed and declared in a certain declaration of trust, executed in writing, by the said Edward A. Nicoll and Orsamus Bushnell, and sealed with their seals, bearing date the eleventh day of April, 1842, as by reference to the said declaration of trust will more fully and at large appear.

"And whereas, a declaration of the objects and intents of said trust is desired and required of us by said trustees, with a view to express and define the powers of said trustees:

"Now, therefore, these presents witness, and we the undersigned, *cestuis que trust* of the estate so granted to said Nicoll and Bushnell, as trustees, do hereby declare and agree to and with said Edward A. Nicoll and Orsamus Bushnell, that the objects and intents of said trust are as follows, viz.: That whenever partition shall be made of the said trust premises amicably by us, or by law, the said trustees shall and will convey to each of us in severalty, our heirs and assigns, or to such person or persons as we severally, or our several heirs or assigns, may designate, our several share of said trust premises, by deed with covenants of warranty against our own acts only; and partition thereof shall be made, if practicable, within six months from the date of said declaration of trust so made by said trustees; but it is not required or expected of said trustees, or either of them, that they will personally do anything to effect such partition, either amicably between us, or by law, but only that they shall execute the conveyances in partition of our several shares to us, when required, after partition has been made by us or our authorized agent, or by legal proceedings, except that if legal proceedings become necessary, then the trustees shall use their names, and promote such partition in all proper ways. And further, that the said trustees may, before partition, sell and convey in due form of law, the said trust premises, or any part thereof, to any person or persons, for such prices, and upon such terms of payment as they may deem fit and proper, and may delegate and appoint, by letter of attorney, all the above powers to William B. Ogden, of Chicago; or in case of his death, sick-

ness, absence from Chicago, or refusal to act, to any other person or persons, without being responsible for any acts, receipts, or defaults of said attorney or attorneys, that may happen, without the wilful default of the said trustees.

"They, the said trustees, accounting to us for all the proceeds of such sale or sales, that shall come into their hands, in the proportions in which we are entitled to the same, first paying and retaining to themselves all the expenses, charges, taxes, assessments, etc., incident to the care and management of said trust property, and the execution of. the said trust, incurred, made, paid, or sustained by them, the said trustees, or their attorney, and that the said trustees shall be liable only, severally and not jointly, for so much money as they may severally receive.

"In witness whereof, we have hereunto set our hands and seals, this twenty-fifth day of April, in the year of our Lord one thousand eight hundred and forty-two.

| | |
|---|---|
| JOHN S. BUSSING. | [SEAL.] |
| EDWARD A. NICOLL. | [SEAL.] |
| W. B. OGDEN. | [SEAL.] |
| B. F. BUTLER. | [SEAL.] |
| CHARLES BUTLER. | [SEAL.] |
| CHESTER CLARK. | [SEAL.] |
| BARTON WHITE. | [SEAL.]" |

This instrument teaches us, that the deed from Butler to Bushnell and Nicoll, was made at the request and direction of the beneficiaries; and that they sanction the declaration of trust made by these trustees, which has been already quoted. It has importance on this account, while some material changes are made in the character of the trust itself and in the authority vested in the trustees. It declares the objects of the trust to be, that whenever partition shall be made of the premises, the trustees shall convey to each in severalty, his heirs and assigns, or to such person as he or his heirs or assigns may appoint, his share in severalty. And further, this instrument expressly authorized the trustees to sell and convey the whole or any portion of the premises, and to appoint a substitute to exercise this last specified power, without being responsible for his default, but only for their own wilful defaults. For the

proceeds of such sales the trustees are required to account to the *cestuis que trust* severally, for their several proportions of the moneys thus received.

While this paper contains the same provision as to the duty of the trustees to convey to the parties in interest severally, their respective proportions, on partition being made, the language is such as to indicate, to some extent at least, that they should not perform the trust till such partition should be made, except by sale of the lands and disposition of the proceeds. Was it, then, the intention of the *cestuis que trust* to place their equitable interests in this property beyond their reach or control, except in the particular mode here specified, that is, till partition should be made, or till the property should be sold by the trustees, and the money divided? Then, from that time forth the trust was executory, and they were not seized of the equitable title, that is, they were not in a position to require the performance of the trust, by the conveyance of the legal title to the *cestuis que trust*. They had no right to the *res* as it was. They had no right, collectively, to its proceeds in money even; but their rights became separate and individual, each one having an individual right to a conveyance of his separate portion of the land after partition, and a right to none of it, till then, but a right only to his proportion of the proceeds of sales, made before partition. With this construction of this paper, this presents one of the best examples of an executory trust to be anywhere found in the books, except in cases arising on the construction of marriage settlements or wills. We have never before been called upon to examine particularly, the distinction between trusts executed and trusts executory; able, logical and perspicuous, as they were. We confess our ideas on the subject were somewhat confused. We have, with patient labor, investigated the subject. There is a well settled distinction between what are called executed and executory trusts, founded, no doubt, to some extent upon artificial reasons, and, as is usual when such is the case, not always of the most easy application. Its purpose and advantage is perhaps more generally to enable the courts to avoid the rule in Shelley's case, for the purpose of

giving effect to a devisor, grantor or donor.   In one sense, all trusts are executory, or to be executed ; that is, something has to be done to perform the trust, that the *cestui que trust* may enjoy the benefits of the trust to which he is entitled. As where one holds a legal title in trust for the benefit of another in whom is already vested the equitable title, with the right to be clothed with the legal title.   But where the beneficiary is not yet clothed with such an equitable title, but has a mere right to have some act done, which will vest in him such equitable title, then the trust is called executory, because of the necessity of the performance of this intermediate act.   These might, perhaps, have been as well designated simple and compound trusts, or direct and remote trusts, or any other expression denoting the different degrees or gradations, between the trustee and the *cestui que trust.*   In the latter, the rights of the *cestui que trust* are less direct and immediate, and the powers, duties and obligations of the trustee are ordinarily greater or more extended than in the former.   Human affairs are so complex and variant—the objects of creating trusts may be so multifarious, and expressed in such variant terms, that there may be difficulty, sometimes, in assigning a particular trust to its proper class.   In one case, this intermediate act may be so clearly expressed, as to leave no doubt that an executory trust was intended, while in another it may be so contingent, discretionary or so vaguely and doubtfully expressed, as to make it difficult to say that it is not an executed trust. In such a case, the courts will give it whichever character will best subserve the apparent purposes of the creator of the trust.   Now, if we assume that the *cestuis que trust*, by this last paper by them executed, intended to provide that the trustee should not convey the land to them in the condition it then was, but only after partition should be made, and then to them in severalty, or should sell it and divide the proceeds among them, it became from that moment an executory trust, because there was something to be done, before they were entitled to a conveyance.   They had no vested equitable title to the land, but they had a mere right to have something done,

which would give them an equitable title, or rather they had a right which, upon the performance of an act by themselves or by the courts, would ripen into an equitable title, or into several equitable titles, to different portions; or, if the trustees chose, they were authorized to sell the land, in which case others had rights severally to their respective portions of the purchase-money. If these were the only rights which these *cestuis que trust* had to or in this property, then we say, this was an executory trust; and dower could not attach to the property thus held, and for the manifest reason that the husband had no title, either legal or equitable, to the land.

But we must now examine and see whether dower had not already attached to this land, before this specification of the trusts by the *cestuis que trust.* If it had so attached, this subsequent act of the husband could not divest it. It is a universal rule, that when the inchoate right to dower is once vested in the wife, that right cannot be divested, except by her own voluntary act, performed in the mode prescribed by law. Let us return, then, to the first conveyance from Butler to Bushnell and Nicoll. Previous to that we had already seen the subject of the trust was personal property, because the object of the trust was a partnership transaction or speculation.

At first, it did not appear that this conveyance was made with the approbation and instruction of the *cestuis que trust,* but for aught that did appear up to the 25th of April, 1842, twenty-five days after the deed was made, this conveyance may have come from the perverse motion of the trustee himself, in violation of his duty as trustee, and without the sanction of his constituents. Had such been the case, it may be, that the new trustees would have taken it upon the same trust, and for the same purposes for which it was held by Butler. At least it would seem reasonable, that as the act was done without their consent, the beneficiaries might insist that the character of the property should not be thereby changed, although as the trust, as it existed in Butler, was accompanied by a special confidence reposed in his discretion, they ought not to be compelled to treat the property longer as personalty,

and intrust the same responsibilities and powers in the new trustees. But it is not necessary to determine what would have been the effect of that conveyance upon the character of the property, which, although real estate in fact, was by the parties and the law treated as personal property, had it been made without the knowledge and sanction of the *cestuis que trust*, for it now appears that it was done with their approval and by their direction. That conveyance then must have its full and legitimate influence in the determination of the question as to whether the property should still be considered personal property, or whether it was thereby re-converted into real estate. What, then, was the effect of that deed? What were the relations between the new trustees and the beneficiaries? What were the duties of the former and the rights of the latter? This is the deed:

"THIS INDENTURE, Made the first day of April, in the year of our Lord one thousand eight hundred and forty-two, between Charles Butler, of the city and county and State of New York, counselor at law, and Eliza A., his wife, of the first part, and Edward A. Nicoll and Orsamus Bushnell, of the same place, trustees, of the second part; *Witnesseth*, that the said parties of the first part, for and in consideration of the sum of ten dollars lawful money of the United States of America, to them in hand paid, by the said parties of the second part, at or before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, have granted, bargained, sold, aliened, remised, released, conveyed, and confirmed, and by these presents do grant, bargain, sell, alien, remise, release, convey, and confirm unto the said parties of the second part, and to the survivors of them, and the heirs and assigns of such survivors forever, all and singular the following lots, pieces, and parcels of land, situate, lying and being in the city of Chicago, county of Cook, and State of Illinois, that is to say:"

[Here follows a description of the property conveyed];

" Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in any way appertaining, and the reversion and reversions, remainder and

remainders, rents, issues and profits thereof, and also *all* the estate, right, title, interest, dower and right of dower, property, possession, claim and demand whatsoever, as well in law as in equity, of the said parties of the first part, of, in or to the above described premises, and every part and parcel thereof, with the appurtenances; *to have and to hold* the above granted and described premises, with the appurtenances, unto the said parties of the second part, as joint tenants and not as tenants in common, and to the survivor of them, and to the heirs and assigns of such survivor, to his and their own proper use, benefit and behoof forever. And the said Charles Butler, for himself, his heirs, executors, administrators, doth hereby covenant, promise, and agree to and with the said parties of the second part, trustees as aforesaid, and to the survivor of them, and the heirs and assigns of such survivor, that he hath not made, done, committed, executed or suffered any act or acts, thing or things, whatsoever, whereby, or by means whereof, the above mentioned and described premises, or any part or parcel thereof, now are, or, at any time hereafter, shall or may be impeached, charged or incumbered in any manner or way whatsoever.

" In witness whereof, the said parties of the first part have hereunto set their hands and seals, the day and year first above written.

CHARLES BUTLER. [SEAL.]<br>ELIZA A. BUTLER. [SEAL.]"

This it will be seen is a trust deed in the simplest form, (if indeed it appears on its face to be a trust deed.) The trust is not specified. There is no limitation or qualification to it. It is left entirely to the law to characterize it, or to say what are the duties of the trustees, and what are the rights of the *cestuis que trust.* They must necessarily be the same as they would be in any other simple trust, where one party holds the legal title to land, in trust for another. If A conveys land to B in trust for C, that is simply a naked executed trust. There the duty at once arises in B to convey to C, which a court of chancery would at once enforce. Is it possible to distinguish such a case from the one before us? That is this case literally.

Butler conveyed the legal title to these premises to Bushnell and Nicoll in joint tenancy, in trust for his *cestuis que trust*, without specifying what they shall do with it, or how long or for what purpose they shall hold it. And this was done by the direction of the *cestuis que trust.* Then it must have been their intention to leave this conveyance to the full operation and influence of the well-known principles of law. Had they designed otherwise—had they designed any special trust,— that the trustees should assume any particular duties or perform any particular functions, other than those raised or imposed by the law itself, upon such a conveyance, it was their duty, and they no doubt would have caused them to be inserted in the deed, or specified in a separate paper, executed at the same time with the deed, and so made to become a part of it. The deed itself could only be controlled by another paper, executed at the same time with it, so as to form a part of it. And the separate papers, executed subsequently on the fourteenth and the twenty-fifth of the same month, can have no influence upon the construction or effect of this deed, nor upon the equitable estate thereby created, prior to their execution. They might, and no doubt did, change the character of the trust, but they could not have a retroactive effect, especially so as to affect in any way the rights of others not parties to them, vested or secured by that deed, or between the time of its execution and these subsequent declarations. If by this deed, the character of this property was re-converted from personalty to realty; if by it an executed trust was created, whereby an equitable estate of inheritance was vested in the *cestuis que trust*, during those twelve first days of April 1842, then during that time, the husband had an estate in the premises upon which the right of dower attached. If she would have been dowable of her husband's interest in these lands, had he died during these twelve days, then that right still continues, for she has done no act to divest herself of it, and as has been before said, that right of dower having once vested in the wife, it could not be divested, except by her own voluntary act performed in the mode specified by our statute. By the application of the most familiar principles of

law to this deed, executed as it was by the direction of the *cestuis que trust*, we see no way of escaping the conclusion, that they were thereby seized of the equitable estate in these lands. As the trust then stood, there was no act then to be done by the courts, by themselves, by the trustees, or by any one else, to complete their equitable title. There was no partition provided for, there was no conveyance directed to be made to any one, there was no sale of the land, and distribution of the purchase-money directed or authorized, nothing remained to be done, in order to vest the equitable title in them, and nothing remained to be done to unite in them the legal with the equitable title, but the simple conveyance of the legal title to them by the trustees. This was the only authority conferred upon or power vested in the trustees, and the only right created in the *cestuis que trust* by this deed. Here was nothing to characterize this as an executory trust, but every ingredient to mark it as an executed trust. If by this deed the equitable estate was not vested in the beneficiaries, it is not easy to conceive a case, in which it would be. It cannot be said, that there was the latent intent of the parties at the time the deed was executed, to give this trust the character into which it was moulded by those subsequent papers, for even those speak in the present tense, and do not profess to have a retroactive operation. If such latent intent was entertained when the deed was made, it was not then executed, nor till at least twelve days subsequently. That an equitable estate of inheritance was designed to be created by this deed, and continued under the declaration and specification of trusts dated the 12th and the 25th of April, there can be no dispute; both these papers, in express terms, declare that the trusts shall be performed to the heirs of the *cestuis que trust*. That it was the design of these papers that the right, title, interest or claim, whatever it was, which the beneficiaries had in this property, should descend to their heirs, instead of going to their personal representatives, is placed beyond all dispute by the express language of these papers. This of itself is sufficient to show a design to re-convert the property into real estate. In any aspect in which

we can view this case, we think the complainant is entitled to have her dower assigned in one-third of the trust half of the Hunter property.

If we are correct in our conclusions thus far, it necessarily follows, that the complainant is entitled to dower in the interest which her husband owned in the Bard trust property. Indeed, if we lay out of view the papers executed on the 12th and the 25th of April, which we have in fact done, the cases are precisely alike. The only difference in the deeds, is that in the first, the word " trustees " is inserted after the names of the grantees, while it is not in the latter deed. But in legal effect, the deeds are precisely alike; whatever estate would be created in the *cestuis que trust* by the one, would also be created by the other. This last deed was also executed by direction of the beneficiaries, and by it was created in the *cestuis que trust*, an equitable estate of inheritance, which by our statute is subject to dower.

Her right to dower in the country lands is not disputed.

The only remaining question is, whether the complainant is entitled to damages because her dower was not assigned in pursuance of her demand on the 29th day of January, 1859. Upon this point, no serious question has been or could be made. Although the defendant refused to assign dower in the utmost good faith, believing she was not entitled to it, yet the claim to damages is the same as if her right had been fully appreciated. She is undoubtedly entitled to damages for the delay, since the demand, as to all the premises in which it was his duty to assign dower, under that demand.

The decree must be reversed, and the suit remanded.

*Decree reversed.*